

**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 10, 2025**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| WOC EVENTS GRAPEVINE, LLC[1] | § | Case No. 25-44313-mxm11 |
| | § | |
| Debtors. | § | Jointly Administered |

### ORDER GRANTING DEBTORS' MOTION TO SELL SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

CAME ON FOR CONSIDERATION the *Debtors' Motion to Sell Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests* (the "Sale Motion," or "Motion")[2] filed by WOC Events Grapevine, LLC, *et al*. (the "Debtors"), the debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy cases (the "Bankruptcy Cases"), requesting the entry of this Order (the "Sale Order") authorizing and approving (A) the asset purchase agreement attached hereto as **Exhibit A** (together with any other document(s) or modifications as may be required and/or necessary to effectuate the transactions contained therein,

---

[1] The Debtors in these chapter 11 bankruptcy cases, along with the last four digits of their federal tax identification numbers are: Laurel Events, LLC (6782); WOC Events Grapevine, LLC (7344); and KellyBain Events, LLC (7171). The Debtors' mailing address is: 1804 Market Center Blvd., Dallas, Texas 75207.

[2] Terms capitalized but not defined herein shall have the meaning ascribed to them in the Motion.

- 1 -

the "<u>APA</u>") by and among (i) the Debtors, and (ii) Enchanted Way Operating LLC ("<u>Operating</u>")

and Enchanted Way Ventures LLC ("<u>Ventures</u>," and collectively with Operating, the "<u>Purchasers</u>"

or "<u>Stalking Horse Purchasers</u>"); (B) authorizing and approving the sale of substantially all of the

Debtors' assets as set forth in the APA (the "<u>Purchased Assets</u>") to the Stalking Horse Purchasers

on terms set forth in the APA (the "<u>Sale</u>"), free and clear of any and all Liens, Claims,

Encumbrances, and Interests (as defined below); (C) approving the assumption and assignment of

the Transferred Contracts; and (D) granting any necessary and additional related relief, all as more

fully described in the Sale Motion.   The Debtors, having determined after a full, fair, and

reasonable marketing process, that the Stalking Horse Purchasers have submitted the highest and

otherwise best Qualified Bid or other bid for the Purchased Assets; and upon adequate and

sufficient notice of the Sale Motion and the hearing on the Motion before the Court on December

10, 2025 (the "<u>Sale Hearing</u>"); and upon the Court having reviewed  and considered the Motion

and all relief related thereto and the statements of counsel and evidence presented in support of the

relief requested by the Debtors in the Sale Motion and at the Sale Hearing; and upon it appearing

that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause

for the relief granted herein; and it appearing that the relief requested in the Motion is in the best

interests of the Debtors, their estates, the creditors, and all parties in interest; and upon it appearing

that this Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, and it appearing

that the Motion is a core proceeding under 28 U.S.C. § 157; and upon adequate notice of the

Motion and opportunity for objection having been given, with no objections having been filed or

with all objections having been resolved or overruled, as the case may be, and it appearing that no

other notice need be given; and upon the record of the Sale Hearing and all other pleadings and

proceedings in these Bankruptcy Cases including the Motion; and after due deliberation and good and sufficient cause appearing therefore,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     **FED. R. BANKR. P. 7052**.  The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of fact are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.     **Jurisdiction & Venue**. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Purchased Assets pursuant to 28 U.S.C. § 1334(e), as such Purchased Assets are property of the Debtors' chapter 11 bankruptcy estates and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b) and, as such, this Court has the authority to enter a final order.  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

C.     **Statutory Predicates**.  The statutory predicates for the relief requested in the Motion are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

D.     **Notice**.  Proper and timely notice of the Sale Motion, Bid Procedures, and Sale Hearing, as well as the proposed Sale contemplated thereby, have been provided to all known

- 3 -

parties entitled to notice thereof, in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all orders of the Court, and related certificates of service filed with the Court.

E. **Opportunity to Object**.  The notices described in the foregoing paragraph and elsewhere in this Sale Order constitute good and sufficient notice under the particular circumstances, and no other or further notice need be given for the granting of the relief requested in the Sale Motion or the Court's entry of this Sale Order.  A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including (a) all potential purchasers previously identified or solicited by the Debtors and/or its advisors prior to and during these Bankruptcy Cases and all other potentially interested parties identified by the Debtors and/or their advisors in the Debtors' business judgment as a potential purchaser or broker for a potential purchaser; (b) all parties who are known to possess or assert any Liens, Claims, and Interests (defined below) in or upon any of the assets of the Debtors; (c) all applicable federal, state, and local governmental units (as defined in section 101(27) of the Bankruptcy Code, "Governmental Units") that have a reasonably known interest in the relief requested in the Sale Motion or the Sale set forth therein; and (d) all counterparties to the Transferred Contracts and/or other of the Debtors' executory contracts or unexpired leases.

F. **Bid Procedures**.  On November 12, 2025, the Court entered the *Order Granting Debtors' Expedited Motion for the Approval of (A) Bid Procedures; and (B) Stalking Horse Protections* [Dkt. No. 39] (the "Bid Procedures Order"), thereby, among other things, approving the Bid Procedures (as defined in the Bid Procedures Order).  The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and

- 4 -

a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets and represent the best method for maximizing the value of the Debtors' estates.  The Debtors conducted the sale process in good faith, without collusion, and in accordance with the Bid Procedures after a robust marketing process.

G.    **Sufficiency of Marketing**.  The Debtors and their advisors, including the Debtors' bankruptcy counsel employed in these Bankruptcy Cases, have conducted a fair and open sale process and have marketed the Purchased Assets to potential purchasers in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures, and Bid Procedures Order, and all other applicable orders of this Court, if any.  The sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, and commercially reasonable opportunity for any entity to make an offer to purchase the Purcased Assets, and the process conducted by the Debtors (with the assistance of its advisors) pursuant to the Bid Procedures Order and the Bid Procedures obtained the highest or best value for the Purchased Assets, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Purchased Assets and the Debtors' estates.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets or submit an objection to the proposed sale, transfer, assumption, and/or assignment of any Purchased Asset or Transferred Contract, as the case may be.  The marketing process undertaken by the Debtors and their advisors and each of the Debtors' respective agents and other representatives with respect to the Purchased Assets have been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all stakeholders in all respects.

4914-6275-6470v.6

H.      **Stalking Horse Purchasers' APA; Assets Property of the Estate**.  On November 3, 2025, the Debtors and the Stalking Horse Purchasers agreed to the terms of the APA.  The Sale transaction contemplated by the APA constitutes a Qualified Bid and the Stalking Horse Purchasers constitute Qualified Bidders, and ultimately the Successful Bidders, each in accordance with the Bid Procedures.  The Purchased Assets the Debtors own and that the Debtors seek to sell and assign to the Stalking Horse Purchasers under the APA are property of the Debtors' bankruptcy estate pursuant to section 541 of the Bankruptcy Code, and title to the portion of the Purchased Assets that belong to the Debtors is vested in the Debtors' estates.

I.      **Auction and Bidding Process**.  Based on the evidence presented during the Sale Hearing, as well as the record in these Bankruptcy Cases, the Debtors have complied with the Bid Procedures and Bid Procedures Order in all respects and has satisfied the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, as necessary for the Court to grant the Sale Motion and enter this Sale Order, including the provisions set forth in the Bid Procedures.

J.      **Corporate Authority**.  Subject to and giving effect to the entry of this Sale Order, the Debtors (a) have full power and authority to execute the APA and all other documents contemplated thereby; (b) have all of the power and authority necessary to consummate the Sale transaction; and (c) have taken all corporate actions necessary to authorize and approve the APA and any actions required to be performed by the Debtors to consummate the sale transaction.  No consents or approvals of the Debtors (other than those expressly provided for in the APA or this Sale Order) are required for the Debtors to consummate the Sale transaction, and any claim or argument to the contrary by any party is hereby overruled or waived.

- 6 -

K.      **Sound Business Purpose**.  Entry into the APA and consummation of the Sale constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, the creditors, and all parties in interest.  This Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to the Stalking Horse Purchasers on the terms and conditions set forth in the APA.  The Court finds that the relief sought in the Motion, including approval of the APA and other documents necessary to effectuate and consummate the Sale of the Purchased Assets to the Stalking Horse Purchasers as contemplated thereunder, is in the best interests of the Debtors' bankruptcy estates, the creditors, and all parties in interest.  The Debtors have demonstrated compelling circumstances and good, sufficient, and sound business purposes and justifications for consummating the Sale prior to, and outside of, a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code (a "Chapter 11 Plan" or "Plan").  The Debtors' decision to enter into the APA and consummate the Sale transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their managers, directors, and officers.  Because the Debtors' entry into the APA and consummation of the Sale constitutes the exercise by the Debtors of sound business judgment, the Debtors and their managers, directors, officers, advisors, professionals, agents, or representatives shall have or incur no liability or be otherwise subject to damages in any manner whatsoever either personally or to the Debtors' bankruptcy estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, fraud, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction.

4914-6275-6470v.6

L.      **Sale Highest or Best Offer**.  In addition to the Debtors' sound exercise of business judgment as to the Sale and the APA: (a) the total consideration provided by the Stalking Horse Purchasers for the Purchased Assets as reflected in the APA is the highest and/or best offer for the Purchased Assets; (b) the APA and the closing of the Sale provided for under the APA presents the best opportunity to realize the maximum value of the Purchased Assets and avoid a decline and devaluation of the Purchased Assets; (c) there is risk of deterioration of the value of the Purchased Assets if the Sale transaction is not consummated promptly; (d) the APA and the consummation of the Sale transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative; and (e) the Debtors' entry into the APA and consummation of the Sale transaction is reasonable and appropriate under the circumstances.  No other person, entity, or group of entities has offered to purchase the Purchased Assets for greater overall value to the Debtors' estate than the Stalking Horse Purchaser.

M.      **Arm's-Length Sale and Stalking Horse Purchasers' Good Faith**.  The APA was negotiated and is undertaken by the Debtors and Stalking Horse Purchasers at arm's length, without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m).  The Stalking Horse Purchasers recognize that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets and willingly subjected their bid to the Bid Procedures.  As a result of the foregoing, the Stalking Horse Purchasers are "good faith purchaser[s]" within the meaning of Bankruptcy Code section 363(m) and, as such, are entitled to all of the protections afforded thereby, including, in the event this Sale Order or any portion thereof is reversed or modified on appeal, and the Stalking Horse Purchasers have proceeded in good faith in all respects in connection with the Sale transaction specifically, and in these Bankruptcy Cases generally.

- 8 -

N.    **No Fraudulent Transfer**.  The total consideration provided by the Stalking Horse Purchasers pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE ANN. § 24.004–006 (West 2019), and any other applicable law and may not be avoided under Bankruptcy Code section 363(n) or any other applicable law.  The APA was not entered into, and the Sale transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Stalking Horse Purchasers have entered into the APA or are consummating the Sale transaction with any fraudulent or otherwise improper purpose.

O.    **Free and Clear Sale Required by the Stalking Horse Purchasers**.  If the Debtors did not sell the Purchased Assets free and clear of all Liens, Claims, Encumbrances, and Interests (defined below), to the extent provided in the APA and under section 363(f) of the Bankruptcy Code, such a sale would have yielded substantially lower value for the Debtors' bankruptcy estates, with less certainty than the Sale transaction.  The Stalking Horse Purchasers would likely not have submitted a bid or entered into the APA, and would likely not consummate the Sale transaction, thus adversely affecting the Debtors, their estate, and the creditors, if the Sale transaction and the assignment of the Purchased Assets, including the Transferred Contracts, to the Stalking Horse Purchasers were not free and clear of all Liens, Claims, Encumbrances, and Interests of any kind or nature whatsoever, to the extent provided in the APA.  Therefore, the Sale contemplated by the APA and approved herein free and clear of all the Liens, Claims, Encumbrances, and Interests is in the best interests of the Debtors, their estates, the creditors, and all other parties-in-interest.

P.    __Sale Free and Clear of Liens, Claims and Interests__.  The APA contemplates the

Sale of the Purchased Assets to the Stalking Horse Purchasers pursuant to the terms and conditions

set forth in the APA and this Sale Order.  The Sale of the Purchased Assets pursuant to the APA

and this Sale Order shall be free and clear of all liens (including any "lien" as defined in section

101(37) of the Bankruptcy Code), interests, obligations, rights, encumbrances, pledges, mortgages,

deeds of trust, security interests, claims (including any "claim" as defined in section 101(5) of the

Bankruptcy Code), leases, possessory leasehold interests, charges, options, rights of first refusal

or option to purchase any real property, easements, servitudes, transfer restrictions under any

agreement, judgments, hypothecations, demands, licenses, sublicenses, assignments, debts,

obligations, guaranties, options, contractual commitments, restrictions, environmental liabilities,

options to purchase, and options, in each case of whatever kind, nature, or description in, against,

or with respect to any of the Purchased Assets, having arisen, existed or accrued prior to and

through the date on which the Sale closes, whether direct or indirect, absolute or contingent, choate

or inchoate, fixed or contingent, matured or unmatured, liquidated or unliquidated, arising or

imposed by agreement, understanding, law, equity, statute, or otherwise and whether arising prior

to, on, or after the Petition Date ("Liens," "Claims," and/or "Interests," as applicable, and

collectively, "Liens, Claims, and/or Interests"), *except* for any such Liens, Claims, and/or Interests

that, by the express terms of the APA or this Sale Order, shall be preserved and remain attached

to the Assets following the Sale and conveyance of the Purchased Assets to the Stalking Horse

Purchasers, if any (collectively, "Permitted Encumbrances").  For the avoidance of doubt, the

term(s) "Liens, Claims, Encumbrances, and Interests," as used in this Sale Order, include, without

limitation, the following:

      i.        any rights, Liens, Claims, or Interests based on any successor or transferee
liability;

ii.        any Liens, Claims, Encumbrances, or Interests that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or termination of the Debtors' or the Stalking Horse Purchasers' interest in the Purchased Assets, or any similar rights;

iii.        any mortgages, deeds of trust, and security interests;

iv.        any pension, multiemployer plan (as such term is defined in § 3(37) or § 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), health or welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multi-employer plan to which the Debtors has at any time contributed to or had any liability or potential liability;

v.        any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and § 4980B of the Internal Revenue Code and of any similar state law, (ix) state discrimination laws, (x) state unemployment compensation laws or any other similar state laws, (xi) any other state or federal benefits or claims relating to any employment with the Debtors or any of its predecessors, or (xii) the WARN Act (29 U.S.C. §§ 2101 et seq.);

vi.        any bulk sales/transfers laws or similar laws;

vii.        any tax statutes or ordinances, including, without limitation, the Internal Revenue Code, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Purcahsed Assets prior to the date of the Sale closing, including, without limitation, any ad valorem taxes assessed by any applicable taxing authority;

viii.        any Contract that is not a Transferred Contract and all the Debtors' obligations thereunder; and

ix.        any Liens, Claims, or Interests that are not Assumed Liabilities (defined below) under the APA or this Sale Order.

For the avoidance of doubt, there are no Permitted Encumbrances under this Sale Order.

Q.      **Bankruptcy Code § 363(f)**.  The Debtors may sell its Purchased Assets free and clear of all Liens, Claims, Encumbrances, and Interests because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied with regard to each such Lien, Claim, Encumbrance, and Interest. The Court finds that the Purchase Price paid for the Purchased Assets exceeds the value of any liens encumbering the Purchased Assets in satisfaction of section 363(f)(3) of the Bankruptcy Code.  As the Purchase Price does not exceed the value of its lien, Huntington Bank, successor by merger to Veritex Community Bank, as senior secured lender, has consented to the Sale on the agreed upon condition its lien attached to the entire Purchase Price proceeds from the Sale less the payment of ad valorem taxes in the amount of $270,272.73 and the sum of $35,000.00 to the Debtors for payment towards administrative costs. Huntington Bank reserves the right to file a proof of claim for the deficiency owing.

R.      **Valid Transfer**.  As of the closing of the Sale under the APA (the "Closing"), pursuant and subject to the terms of the APA and this Sale Order, the Sale will effect a legal, valid, enforceable, and effective transfer of the Purchased Assets and will vest the Stalking Horse Purchasers with all of the Debtors' right, title, and interest in the Purchased Assets free and clear of all Liens, Claims, Encumbrances, and Interests with such Liens, Claims, Encumbrances, and Interests attaching to the proceeds from the Sale of the Purchased Assets (the "Sale Proceeds") with the same nature, validity, priority, extent, perfection, force, and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Sale Order.

S.      **No Successor Liability**.  Neither the Stalking Horse Purchasers nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Stalking Horse Purchasers nor any of its affiliates shall assume, or in any way be

responsible for, any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Liabilities, to the extent provided in the APA or this Sale Order.

T.      **Assets Assignable**.  The Debtors' interest in the Owned Real Property and all other Purchased Assets are subject to assignment or sale free and clear of all Liens, Claims, Encumbrances, and Interests in accordance with the terms and conditions of this Sale Order and the APA.   Each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, have been, or will be following the entry of this Sale Order, satisfied in accordance with applicable law or are otherwise unenforceable under section 365 of the Bankruptcy Code in respect of the assignment of Purchased Assets pursuant to the Sale.  For the avoidance of doubt, and based on the evidence presented, should any consent be conditioned on reasonableness, this Court finds a party's failure to provide consent to the proposed assignment unreasonable given the circumstances.   If Debtors and Stalking Horse Purchasers failed to obtain a necessary and unconditioned consent to assignment that would otherwise preclude assignment as a matter of law, the Purchased Assets subject to such assignment shall be treated in accordance with the terms and conditions of the APA.

U.      **No Sub Rosa Plan**.  The APA and the Sale transaction do not constitute a *sub rosa* Chapter 11 Plan for the Debtors.  The APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a Chapter 11 Plan for the Debtors.

V.      **Final Order**.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a), and the Court has the constitutional authority to enter a final order with respect to the Motion.  Time is of the essence in consummating the Sale, and in order to maximize the

value of the Purchased Assets, it is essential that the sale and assignment of the Purchased Assets occurs within the time constraints set forth in the APA and the Bid Procedures Order. Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 7054, the Court expressly finds no just reason for delay in the implementation of this Sale Order, and expressly directs the immediate entry and effectiveness without stay of this Sale Order as set forth herein. The consummation of the Sale of the Assets to the Purchaser is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), and 365.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     **Objections Overruled**. To the extent that any objections to the Sale have not been withdrawn, waived, or settled, such objections and all reservations of rights included therein are hereby overruled on the merits. Any and all parties who did not object or who withdrew their objections to the Sale Motion or the Sale are hereby precluded from contesting the Sale contemplated under the APA pursuant to Bankruptcy Code sections 362(f)(3), and/or 365, or any other applicable provision of the Bankruptcy Code, and also pursuant to the Bid Procedures Order.

2.     **Sale Approval**. The relief requested in the Sale Motion, as implemented by the Bid Procedures Order, and the Sale of the Assets to the Purchaser pursuant to the APA is hereby **GRANTED** and **APPROVED** in its entirety. Pursuant to Bankruptcy Code sections 105 and 363 the APA and the Sale and conveyance of the Debtors' Purchased Assets to the Stalking Horse Purchasers as of the Closing are hereby approved, and the Debtors are authorized and directed to consummate the Sale, including the sale, assignment, conveyance, and deliverance of all of the

- 14 -

Debtors' right, title, and interest in the Purchased Assets to the Stalking Horse Purchasers free and clear of any and all Liens, Claims, Encumbrances, and Interests in accordance with the terms of and subject to the satisfaction or waiver of the conditions to the Debtors' obligations to consummate the Sale set forth in the APA, with such Liens, Claims, Encumbrances, and Interests attaching to the Sale Proceeds with the same nature, validity, priority, extent, perfection, force, and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Sale Order.  Notwithstanding the foregoing, the sale of the Purchased Assets to the Stalking Horse Purchasers shall not be free and clear of any and all Permitted Encumbrances as otherwise defined above.

3.  **Authority to Consummate Sale**.  Pursuant to Bankruptcy Code sections 105 and 363 the Debtors and the Stalking Horse Purchasers, as applicable, are each hereby authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale; (b) enter into the APA; (c) perform the obligations of the Debtors under the APA and any and all additional instruments and documents that may be contemplated by or reasonably necessary or desirable to implement the APA and consummate, implement, and close the Sale and any other transactions contemplated thereby prior to or after the Closing without further order of this Court; and (d) enforce the terms of this Sale Order.  The Stalking Horse Purchasers and the Debtors shall have no obligation to consummate the Sale except as is contemplated by and provided for in the APA.

4.  **Automatic Stay**.  The Stalking Horse Purchasers shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code section 362 to enforce any of its remedies under the APA or any other documents related thereto.  The automatic stay imposed by Bankruptcy Code section 362 is modified solely to the extent necessary to implement the provisions of this Sale Order and the Sale of the Purchased Assets to the Stalking Horse Purchasers.

- 15 -

5.      **Binding Effect**.  This Sale Order and the APA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of Liens, Claims, Encumbrances, or Interests in, against, or on all or any portion of the Purchased Assets (whether known or unknown), the Stalking Horse Purchasers and their respective successors and permitted assigns, notwithstanding the dismissal of any of the Debtors' case or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these Bankruptcy Cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the APA shall not be subject to rejection or avoidance under any circumstances.  If any order under Bankruptcy Code section 1112 is entered and/or a liquidating trust is formed in these Bankruptcy Cases, such order shall provide, or be deemed to provide (in accordance with Bankruptcy Code sections 105 and 349) that all rights and obligations of the Debtors under this Sale Order and the APA shall accrue to, and be for the benefit of, and shall be exercisable by, the estates, as provided by any order of the Bankruptcy Court, and the estates shall be entitled to exercise all of the rights of the Debtors under the APA.  The APA, this Sale Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any Chapter 11 Plan proposed or confirmed in the Bankruptcy Cases, any order confirming any Chapter 11 Plan, or any subsequent order of this Court without the prior written consent of the Stalking Horse Purchasers.  To the extent of any conflict between this Sale Order or the APA and such future Plan or order, the terms of this Sale Order and the APA shall control.

6.      **Modifications**.  The APA and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further

- 16 -

4914-6275-6470v.6

order of this Court; *provided, however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates. Further, no modifications to the APA or any related agreement regarding the Purchas Price can be made without Huntington Bank's express written consent.

7. **Sale Free and Clear**. The Purchased Assets shall be sold and/or otherwise transferred to the Stalking Horse Purchasers at Closing free and clear of any and all Liens, Claims, Encumbrances, and Interests. Any and all Liens, Claims, Encumbrances, and Interests related to the Purchased Assets shall attach solely to the Sale Proceeds with the same validity, enforceability, priority, force, and effect as they had against the Purchased Assets immediately prior to the Closing, and subject to the rights, claims, defenses, and objections, if any, of the Debtors (and/or its estate) and all parties in interest with respect to such Liens, Claims, Encumbrances, and Interests.

8. **2025 Ad Valorem Taxes**. Notwithstanding anything to the contrary in this Order or the APA (or similar agreement), the secured ad valorem tax claims (the "Tax Claims") of the City of Grapevine, Grapevine-Colleyville ISD, Tarrant County, and Dallas County (collectively, the "Texas Taxing Authorities") owed by the Debtors for the year 2025 and any prior year pertaining to the Purchased Assets, shall be paid within fourteen (14) days of the closing of the Sale. For the avoidance of doubt, the Tax Claims are as follows: (i) the City of Grapevine is owed $46,842.32, (ii) Grapevine-Colleyville ISD is owed $175,057.95, (iii) Tarrant County is owed $47,229.08, and (iv) Dallas County is owed $1,143.38.

9. **2026 Ad Valorem Taxes**. For the avoidance of doubt, the 2026 ad valorem taxes (the "2026 Taxes") of the Texas Taxing Authorities that will be incurred on January 1, 2026, are Permitted Encumbrances as defined in the APA. The Stalking Horse Purchasers assume full

- 17 -

4914-6275-6470v.6

responsibility for the 2026 Taxes and shall be responsible for paying the 2026 Taxes in full, in the ordinary course of business, when due.  If not timely paid, the Texas Taxing Authorities may proceed with non-bankruptcy collections against the Stalking Horse Purchasers, without leave or approval of the Court.  Any dispute regarding the proration of the ad valorem taxes between the Debtors and Stalking Horse Purchasers shall have no effect on the Stalking Horse Purchasers' responsibility to pay the 2026 Taxes.  The Texas Taxing Authorities shall retain their respective liens against the Purchased Assets, as applicable, until paid in full, including any applicable penalties or interest.

10.    **Injunction**.  Subject in each case to the terms and conditions of the APA, upon Closing, all parties holding claims (as defined in Bankruptcy Code section 101(5)) against the Debtors or their bankruptcy estates, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated, arising before the Closing or with Liens, Claims, Encumbrances, and Interests in or against the Purchased Assets existing before the Closing, shall be, and hereby are, with respect to any and all such Liens, Claims, Encumbrances, and Interests, permanently enjoined from: (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, the Stalking Horse Purchasers or the Purchased Assets, or any direct or indirect transferee of any of the Purchased Assets, or direct or indirect successor in interest to, the Stalking Horse Purchasers; (b) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against the Stalking Horse Purchasers or the Purchased Assets or any direct or indirect transferee of any of

- 18 -

the Purchased Assets, or direct or indirect successor in interest to, the Stalking Horse Purchasers; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any and all Liens, Claims, and Encumbrances of any kind against the Stalking Horse Purchasers or the Purchased Assets, or any direct or indirect transferee of any of the Purchased Assets, or successor in interest to, the Stalking Horse Purchasers; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Sale Order; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Sale Order. The provisions of this paragraph shall not be applicable to any liability assumed under the APA or to claims or causes of action arising after Closing out of executory contracts assumed and assigned in accordance with the terms of the APA. This paragraph is intended to ensure that the Stalking Horse Purchasers are acquiring the Purchased Assets free and clear of all such Liens, Claims, Encumbrances, and Interests in accordance with section 363(f) of the Bankruptcy Code, and is intended to enjoin holders of such Liens, Claims, Encumbrances, and Interests from seeking to enforce those Liens, Claims, Encumbrances, and Interests against Stalking Horse Purchasers' Assets after Closing.

11.   **Transfer of Title**. The Sale and transfer of the Purchased Assets pursuant to this Sale Order and the APA will vest the Stalking Horse Purchasers with valid and indefeasible title to the Purchased Assets, and will be a legal, valid, and effective sale and transfer of the Purchased Assets to the Stalking Horse Purchasers free and clear of any and all Liens, Claims, Encumbrances, and Interests, with such Liens, Claims, Encumbrances, and Interests attaching to the Sale Proceeds with the same nature, validity, priority, extent, perfection, force and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Sale Order; *provided, however*, that, except as and to the extent expressly set forth in the APA,

the Debtors expressly disclaim any representation or warranty, express, statutory or implied, as to title to any of the Purchased Assets.

12.     **Valid Transfer**.  Effective upon the Closing, the transfer to the Stalking Horse Purchasers of the Debtors' right, title, and interest in the Purchased Assets pursuant to the APA shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right, title, and interest in the Purchased Assets, and vests with, or will vest in, the Stalking Horse Purchasers all right, title, and interest of the Debtors in the Purchased Assets, free and clear of any and all Liens, Claims, and Interests.  No bulk sales laws or any similar law of any state or other jurisdiction shall apply in any way to the Sale transaction, the Motion, and this Sale Order.  The terms of the APA are fair and reasonable, and the Sale transaction set forth therein shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

13.     **No Successor Liability**.  Neither the Stalking Horse Purchasers nor any of their affiliates are or shall be deemed, as a result of the consummation of the Sale transaction, to: (a) be legal successors to the Debtors or their estates by reason of any theory of law or equity; (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect.  Neither the Stalking Horse Purchasers nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their estates, other than the Assumed Liabilities, to the extent provided in the APA or this Sale Order.

14.     **Release of Interests**.  Effective upon the Closing, this Sale Order: (a) is and shall be effective as a determination that all Liens, Claims, Encumbrances, and Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been

- 20 -

unconditionally released, discharged, and terminated (with such Liens, Claims, Encumbrances, and Interests attaching to the Sale Proceeds with the same nature, validity, priority, extent, perfection, force and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Sale Order) and that the conveyances described herein have been effected; and (b) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Stalking Horse Purchasers, and all recorded Liens, Claims, Encumbrances, and Interests against the Purchased Assets shall be deemed stricken from such entities records, official and otherwise.

15. **Approval to Release Interests**. If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing Liens, Claims, Encumbrances, or Interests against or on the Purchased Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, Encumbrances, and Interests that the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Stalking Horse Purchasers are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets. The Stalking Horse Purchasers are hereby authorized

to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Encumbrances, and Interests.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

16.    **Surrender of Possession**.   Any and all Purchased Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Stalking Horse Purchasers free and clear of all Liens, Claims, Encumbrances, and Interests with such Liens, Claims, Encumbrances, and Interests attaching to the Sale Proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Sale Order, and shall be delivered to the Stalking Horse Purchasers and deemed delivered at the time of Closing (or such other time as provided in the APA).

17.    **Distribution of Sales Proceeds**.  Within fourteen (14) days following the Closing Date, the Debtors shall disburse, or authorize the disbursement of the Sale Proceeds as follows:

A.    $270,272.73 to the ad valorem taxing authorities for the past due 2023, 2024, and 2025 Tax Claims to the Texas Taxing Authorities;

B.    $35,000 to the Debtors to be applied towards administrative costs;

C.    The remainder of the Purchase Price in the amount of $3,004,727.27 directly to Huntington Bank as senior secured lender.

18.    **Allocation of Assets**.  The Stalking Horse Purchasers are hereby authorized in connection with the consummation of the Sale transaction to allocate the Purchased Assets among their affiliates in a manner as it in its sole discretion deems appropriate, and to assign any of the Purchased Assets to its affiliates with all of the rights and protections accorded to the Stalking

Horse Purchasers under this Sale Order and the APA with respect thereto, in each case, to the extent permitted by, and in accordance with, the terms of the APA.

19.    **Exculpation**.  Because the entry into the APA and the other transaction documents, as well as the consummation of the Sale transaction, constitute the exercise by the Debtors of their sound business judgment, the Debtors and their respective managers, directors, officers, representatives, advisors, professionals or agents, shall neither have, nor incur, any liability or otherwise be subject to any damages whatsoever either personally or to the bankruptcy estate or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, fraud, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction pursuant to a final order.

20.    **Indemnification by Purchaser**.  From and after the Closing, the Stalking Horse Purchasers shall release, defend, indemnify and hold the Debtors and each of its respective managers, directors, officers, agents and successors harmless from and against any and all losses, liabilities, obligations, damages, costs, and expenses based upon, attributable to or resulting from: (a) any breach of any representation or warranty of Stalking Horse Purchasers, as set forth in the APA, or any representation or warranty contained in any certificate delivered by or on behalf of Stalking Horse Purchasers; (b) any breach of any covenant or other agreement on the part of Stalking Horse Purchasers under the APA; (c) the Assumed Liabilities; and (d) any other indemnity obligations of Stalking Horse Purchasers and its affiliates expressly set forth in the APA.

21.    **Prohibition of Actions Against Purchaser**.  Except for the Assumed Liabilities, or as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, the

Stalking Horse Purchasers and their affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein and in the APA, the Stalking Horse Purchasers and their affiliates shall not be liable for any claims against the Debtors, and the Stalking Horse Purchasers and their affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, successor or transferee liability, labor law, ERISA, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing. Effective upon the Closing, with the sole exception of any enforcement of rights related to the Assumed Liabilities or as otherwise provided in the APA, all persons and entities shall be, and hereby are, forever barred and estopped from (a) taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Stalking Horse Purchasers in accordance with the terms of this Sale Order and the APA and (b) asserting, prosecuting, or otherwise pursuing, whether in law or in equity, in any judicial, administrative, arbitral or other proceeding, any Liens, Claims, Encumbrances, and/or Interests of any kind or nature whatsoever against the Stalking Horse Purchasers and its successors, designees, assigns, or property, or the Purchased Assets conveyed under this Sale Order in accordance with the APA.

22. **No Interference**.    Following the Closing, no holders of Liens, Claims, Encumbrances, and Interests in or against the Debtors or the Purchased Assets shall interfere with

the Stalking Horse Purchasers' title to or use and enjoyment of the Purchased Assets based on or related to any Liens, Claims, Encumbrances, and Interests.

23. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including retaining jurisdiction to: (a) compel delivery of the Purchased Assets or performance of other obligations owed to the Stalking Horse Purchasers; (b) compel performance of obligations owed to the Debtors; (c) resolve any disputes arising under or related to the APA or the Sale transaction; (d) interpret, implement, and enforce the provisions of this Sale Order; (e) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Stalking Horse Purchasers to evidence the release of any Liens, Claims, Encumbrances, and Interests in or against  the Purchased Assets; (f) protect the Stalking Horse Purchasers and their affiliates against (i) any Liens, Claims, Encumbrances, and Interests in or against the Debtors or the Purchased Assets of any kind or nature whatsoever and (ii) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets that may be in its possession; and (g) protect the Debtors against any liabilities (other than any liabilities retained by the Debtors under the APA) in any way relating to the Purchased Assets arising on or after the Closing Date other than to the Stalking Horse Purchasers pursuant to the APA.

24. **Immediate Effect**.  For good cause shown, this Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or other applicable law or procedural rules, and the provisions of this Sale Order shall be self-executing.  The Debtors and the Stalking Horse Purchasers are authorized to close the Sale

- 25 -

transaction immediately upon entry of this Sale Order and are authorized to satisfy the conditions to Closing (as set forth in the APA), as soon as reasonably practicable.

25. **Good Faith Purchaser**. The Sale transaction contemplated by the APA is undertaken by the Purchaser in good faith, as that term is used in Bankruptcy Code section 363(m), and the Stalking Horse Purchasers have acted without collusion in undertaking the Sale transaction contemplated by the APA. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale transaction shall not affect the validity of the sale of the Purchased Assets to the Stalking Horse Purchasers (including the assumption and assignment by the Debtors of any of Transferred Contracts), unless such authorization is duly stayed pending such appeal. The Stalking Horse Purchasers are buyers in good faith of the Purchased Assets, and are entitled to all of the protections afforded by Bankruptcy Code § 363(m).

26. **Inconsistencies with Prior Orders, Pleadings, or Agreements**. To the extent of any conflict between the APA and this Sale Order, the terms of the Sale Order shall govern. To the extent this Sale Order is inconsistent or conflicts with any prior order or pleading in these Bankruptcy Cases, the terms of this Sale Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale transaction.

27. **Subsequent Orders and Plan Provisions**. Unless otherwise agreed to by the Debtors and the Stalking Horse Purchasers, nothing contained in any Chapter 11 Plan of reorganization or liquidation, or order of any type or kind entered in (a) these Bankruptcy Cases, in (b) any subsequent Chapter 7 case into which any of these Bankruptcy Cases may be converted, or in (c) any related proceeding subsequent to entry of this Sale Order shall conflict with or

4914-6275-6470v.6

derogate from the provisions of the APA (as modified by this Sale Order, if at all) or the terms of this Sale Order.

28.    **Failure to Specify Provisions**.  The failure to specifically reference any particular provisions of the APA or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

29.    **Satisfaction of Conditions Precedent**.  Neither the Stalking Horse Purchasers nor the Debtors shall have an obligation to close the Sale transaction until all conditions precedent in the APA to each of their respective obligations to close the Sale transaction have been satisfied or waived in accordance with the terms of the APA.

30.    **Provisions Non-Severable**.  The provisions of this Sale Order are non-severable and mutually dependent.

# # # END OF ORDER # # #

Submitted by:

Thomas D. Berghman
Texas Bar No. 24082683
Jacob J. King
Texas Bar No. 24136951
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard St., Ste. 4000
Dallas, Texas 75201
Telephone: (214) 855-7500
Email: tberghman@munsch.com
        jking@munsch.com

PROPOSED COUNSEL TO THE DEBTOR
AND DEBTOR-IN-POSSESSION

4914-6275-6470v.6

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**ENCHANTED WAY OPERATING LLC, AND**

**ENCHANTED WAY VENTURES LLC,**

**(COLLECTIVELY, "PURCHASERS"), AND**

**KELLYBAIN EVENTS, LLC,**

**LAUREL EVENTS, LLC, AND**

**WOC EVENTS GRAPEVINE, LLC,**

**(COLLECTIVELY, "SELLERS")**

**NOVEMBER 3, 2025**

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE ................................................................................................ 1
    1.1    Purchase and Sale ............................................................................................... 1
    1.2    Excluded Assets .................................................................................................. 2
    1.3    Assumed Liabilities ............................................................................................ 3
    1.4    Excluded Liabilities ............................................................................................ 3
    1.5    Transferred Contracts; Cure Amounts ................................................................ 4
    1.6    Closing ............................................................................................................... 5
    1.7    Purchase Price .................................................................................................... 6
    1.8    Title Passage; Delivery of Purchased Assets ..................................................... 6

ARTICLE II REPRESENTATIONS AND WARRANTIES OF SELLERS ............................................. 6
    2.1    Organization, Standing, Power .......................................................................... 6
    2.2    Authority; Noncontravention. ............................................................................ 7
    2.3    Title to Purchased Assets ................................................................................... 7
    2.4    Material Contracts .............................................................................................. 7
    2.5    Financial Statements .......................................................................................... 7
    2.6    Undisclosed Liabilities ....................................................................................... 8
    2.7    Compliance with Laws ....................................................................................... 8
    2.8    Real Property ...................................................................................................... 8
    2.9    Intellectual Property ........................................................................................... 9
    2.10    Permits ............................................................................................................... 9
    2.11    Accounts Receivable .......................................................................................... 9
    2.12    Legal Proceedings ............................................................................................ 10
    2.13    No Warranties .................................................................................................. 10

ARTICLE III REPRESENTATIONS AND WARRANTIES OF PURCHASER ................................... 10
    3.1    Organization, Standing and Power ................................................................... 10
    3.2    Authority; Non-contravention. ......................................................................... 10
    3.3    Financial Capacity ........................................................................................... 11
    3.4    Purchased Assets "AS IS"; Certain Acknowledgements .................................. 11

ARTICLE IV ADDITIONAL AGREEMENTS .............................................................................. 11
    4.1    Actions Pending Closing .................................................................................. 11
    4.2    Access to Information ....................................................................................... 12
    4.3    Confidentiality ................................................................................................. 12
    4.4    Press Release ................................................................................................... 13
    4.5    Sale Process; Bankruptcy Court Matters .......................................................... 13
    4.6    Employee Matters ............................................................................................ 15
    4.7    Tax Matters ...................................................................................................... 15
    4.8    Collection of Accounts Receivable .................................................................. 16

ARTICLE V CONDITIONS AND CLOSING DELIVERIES .......................................................... 17
    5.1    Conditions to Obligations of Purchasers .......................................................... 17
    5.2    Conditions to Obligations of Sellers ................................................................ 18

ARTICLE VI TERMINATION .................................................................................................. 19
    6.1    Events of Termination ...................................................................................... 19

i

6.2     Effect of Termination..................................................................................................... 19

ARTICLE VII GENERAL PROVISIONS ......................................................................................... 20
7.1     Survival and Indemnity .............................................................................................. 20
7.2     Further Assurances...................................................................................................... 20
7.3     Notices ........................................................................................................................ 20
7.4     Interpretation; Rules of Construction ........................................................................ 21
7.5     Severability ................................................................................................................ 22
7.6     Amendments; Waiver.................................................................................................. 22
7.7     Entire Agreement ....................................................................................................... 22
7.8     Assignment.................................................................................................................. 22
7.9     Governing Law ........................................................................................................... 23
7.10    JURISDICTION; WAIVER OF JURY TRIAL .......................................................... 23
7.11    Expenses...................................................................................................................... 23
7.12    Attorneys' Fees ........................................................................................................... 23
7.13    Counterparts ............................................................................................................... 23

EXHIBITS –

| Exhibit A | Definitions |
| Exhibit B | Form of Approval Order |
| Exhibit C | Form of Assignment and Assumption Agreement |
| Exhibit D | Form of Bill of Sale |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>") is made and entered into as of October __, 2025 (the "<u>Agreement Date</u>"), by and among Enchanted Way Operating LLC, a Texas limited liability company ("<u>Purchaser OpCo</u>"), Enchanted Way Ventures LLC ("<u>Purchaser PropCo</u>", and together with Purchaser OpCo, "<u>Purchaser</u>"), KellyBain Events, LLC, a Texas limited liability company ("<u>KellyBain</u>"), Laurel Events, LLC, a Texas limited liability company ("<u>Laurel</u>"), WOC Events Grapevine, LLC, a Texas limited liability company ("<u>Property Owner</u>", and together with KellyBain and Laurel, each, a "<u>Seller</u>", collectively, the "<u>Sellers</u>"). Purchaser and the Sellers are collectively referred to as the "<u>Parties</u>". Certain other capitalized terms used herein are defined in <u>Exhibit A</u>.

## RECITALS

WHEREAS, on November 5, 2025, Laurel filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division) (the "<u>Bankruptcy Court</u>"). Laurel is operating as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (the "<u>Laurel Bankruptcy Case</u>").

WHEREAS, on November 3, 2025, Property Owner filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division). Property Owner is operating as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (the "<u>Property Owner Bankruptcy Case</u>").

WHEREAS, on November 5, 2025 (the "<u>Petition Date</u>"), KellyBain filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (Fort Worth Division). KellyBain is operating as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (the "<u>KellyBain Bankruptcy Case</u>").

WHEREAS, the Sellers' respective chapter 11 bankruptcy cases are jointly administered in *In re WOC Events Grapevine, LLC*, No. 25-44313 (Bankr. N.D. Tex. Nov. 3, 2025) (collectively, the "<u>Bankruptcy Case</u>")

WHEREAS, Purchaser desires to purchase from Sellers and Sellers desire to sell to Purchaser the Purchased Assets (as defined below) in accordance with sections 105, 363, and 365 and other applicable provisions of the Bankruptcy Code and subject to the terms and conditions of, and all as more particularly set forth in, this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the representations, warranties, covenants and other agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1     <u>Purchase and Sale</u>. Pursuant to Sections 105 and 363 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement, Purchaser agrees to purchase, acquire and accept from Sellers, and Sellers agree to sell, transfer, assign, convey and deliver to Purchaser, at the Closing, all

assets owned or used by Sellers in the operation of the Property as a hospitality venue (the "Business"), except to the extent that any of the following are Excluded Assets (collectively, the "Purchased Assets"):

(a)     all right, title and interest in the Sellers-owned Intellectual Property and, to the extent assignable, Sellers' rights in any Third Party Intellectual Property (collectively, the "Purchased Intellectual Property");

(b)     the Owned Real Property (which shall be assigned to Purchaser PropCo);

(c)     all Accounts Receivable, including but not limited to the Unpaid A/R pursuant to the Transferred Contracts which are set forth in Schedule 1;

(d)     the Purchased Intellectual Property;

(e)     all right, title and interest of Sellers in and to all Transferred Contracts;

(f)     all of Sellers' supplies, computers, printers, machinery, equipment, furniture, fixtures and other tangible personal property owned by Sellers or used in the Business;

(g)     all Documents that are related to the Purchased Assets, to the extent reasonably available, which are not subject to claims of attorney-client privilege and which do not relate to matters subject to employee privacy rights under applicable Law; provided that a copy of all such Documents may be retained by the Sellers and may be provided to Purchaser to the extent allowed by applicable law;

(h)     to the extent assignable, all rights under or pursuant to any warranties made by vendors, suppliers, manufacturers, contractors, and any other person solely to the extent relating to the Purchased Assets; and

(i)     the goodwill associated with the Purchased Assets.

To the extent that any tangible or intangible assets or rights are discovered or identified at any time after the Closing Date that, pursuant to this Agreement, constitute Purchased Assets (or would have been if such assets or rights had been listed in the applicable schedules) and should have been transferred to Purchaser, Sellers shall immediately transfer and promptly deliver them (or cause them to be delivered) to Purchaser without additional payment.

1.2     Excluded Assets. Notwithstanding anything contained herein or in any other instrument, conveyance or document delivered pursuant to this Agreement to the contrary, Sellers shall not sell, transfer, assign or convey to Purchaser any interest in or to any asset or property other than the Purchased Assets, including each of the following (collectively, the "Excluded Assets"):

(a)     all Sellers' Cash Equivalents and bank accounts;

(b)     all reserves, prepayments, prepaid expenses, advance payments, deposits (except for deposits associated with any Transferred Contracts), surety accounts and retainages, including made or given by or to any customer, supplier, manufacturer, contractor or utilities or surety provider, in each case to the extent relating to any of the other Excluded Assets or Excluded Liabilities;

(c)     all corporate minute books and stock records or similar corporate records of Sellers and the Tax Returns and other Tax records of the Sellers;

(d)       shares of any direct or indirect subsidiary of Sellers and any equity interest in any Person;

(e)       all rights in and to all Contracts, other than the Transferred Contracts (the "Excluded Contracts");

(f)       all Benefit Plans and all funds or Contracts related thereto;

(g)       all licenses and permits relating to the sale of liquor or alcoholic beverages;

(h)       all insurance policies and all rights to proceeds thereunder, other than those relating to any of the Purchased Assets or Assumed Liabilities;

(i)       all rights, claims and causes of action of whatever kind or character, including all of Sellers' rights, claims and causes of action under chapter 5 of the Bankruptcy Code; and

(j)       the rights of Sellers under this Agreement or the Ancillary Agreements and all consideration payable or deliverable to Sellers under this Agreement or the Ancillary Agreements.

1.3       Assumed Liabilities. Purchaser is not a successor-in-interest to the Sellers and shall bear no successor liability for any of the Sellers' liabilities not expressly assumed herein, and the Approval Order shall indicate the Purchaser shall in no way be liable under any successor liability or similar claim.  Upon the terms and subject to the conditions of this Agreement, Purchaser shall, effective as of the Closing, assume and agree to discharge and perform when due, only the following Liabilities of Sellers (collectively, the "Assumed Liabilities"):

(a)       all Liabilities arising out of or relating to the Purchased Assets (other than the Transferred Contracts), but only to the extent such Liabilities arise out of Purchaser's use or operation of the Purchased Assets after the Closing Date; and

(b)       those Liabilities of Sellers arising from or related to the Transferred Contracts (i) for which all necessary consents and/or Bankruptcy Court approval to transfer have been obtained, (ii) relating solely to the period after the Closing and not to the extent arising out of or relating to any breach or default thereof or other activities on or prior to the Closing and (iii) not arising under, or relating to, any amendment to, or modification of, any such Transferred Contract that was not expressly listed on Schedule 1 as of the Closing Date.

1.4       Excluded Liabilities. Notwithstanding anything else herein to the contrary, except for the Assumed Liabilities, Purchaser shall not assume, agree to pay, discharge, or satisfy, or otherwise have any responsibility, Liability, or obligation for any Liability of Sellers or any Affiliate of Sellers (collectively, the "Excluded Liabilities"), including for avoidance of doubt any Liabilities:

(a)       related to or arising out of any Excluded Asset;

(b)       under any of Sellers' or their Affiliates' Contracts, other than those Liabilities expressly contemplated by Section 1.3;

(c)       related to any and all Cure Amounts which shall be satisfied at Closing;

(d)       under or related to any Benefit Plan;

-3-

(e)     related to or arising out of the ownership, use or operation of the Sellers' businesses or the Purchased Assets on or before the Closing Date, including those arising under any Law;

(f)     related to any current, former or alleged, shareholder, partner, member, equity holder, director, manager or other officer of Sellers;

(g)     related to or arising out of the employment of any current or former employee or other service provider of either Seller on or prior to the Closing Date, including any Liability of either Seller constituting workers' compensation claims of such personnel with respect to occurrences on or prior to the Closing Date, and any Liability of either Seller in connection with the termination of employment of any current or former employee or other service provider of either Seller;

(h)     all Indebtedness of Sellers; and

(i)     related to any Taxes of the Sellers, any Transfer Taxes, and any Taxes imposed on or with respect to the Purchased Assets for a taxable period (or portion thereof) ending on or before the Closing Date.

1.5     <u>Transferred Contracts; Cure Amounts</u>.

(a)     <u>Schedule 1</u> sets forth: (i) a list of all executory Contracts to which either of the Sellers is a party and which Purchaser has designated to include in the Purchased Assets (as such list may be updated from time to time in accordance with the terms of this Agreement, the "<u>Transferred Contracts</u>") and (ii) the Cure Amounts for each Transferred Contract (the "<u>Estimated Cure Amounts</u>") (and if Sellers determine in good faith that no Cure Amount is estimated to be payable in respect of any particular Transferred Contract, the amount of such Estimated Cure Amount designated for such Transferred Contract shall be "$0.00"). During the Pre-Closing Period, Sellers shall, on a weekly basis (unless otherwise agreed by Purchaser), and at any time as may be requested by Purchaser, update, amend, and supplement the Estimated Cure Amounts for each of the Transferred Contracts, including estimated amounts necessary to cure monetary defaults thereunder as well as any non-monetary defaults thereunder. On or before the date that is at least fourteen (14) calendar days prior to the Sale Hearing, Sellers shall file with the Bankruptcy Court, an Assumption and Assignment Notice in a form reasonably acceptable to Purchaser and, included therewith, a list that specifies: (i) each of Sellers' executory Contracts and unexpired leases, including the name of the non-Seller counterparty to each such contract, and (ii) the Estimated Cure Amount for each such Contract or lease in the event that such Contract is ultimately a Transferred Contract. The Sale Procedures Order shall set forth an objection deadline for such non-Seller counterparty to object to the applicable Estimated Cure Amount (which objection deadline shall be no later than seven (7) calendar days prior to the Sale Hearing). If any non-Seller counterparty objects to the applicable Estimated Cure Amounts, Sellers shall keep Purchaser reasonably informed as to the resolution of such objection. Purchaser shall have the absolute right to include or exclude any contract as part of the Transferred Contracts (listed on Schedule 1) at any time up until the Closing for any reason in its sole discretion.

(b)     If prior to or following Closing, it is discovered that a Contract should have been listed on <u>Schedule 1</u> but was not so listed, or a Contract is entered into after the Agreement Date but prior to the Closing Date, (any such Contract, a "<u>Previously Omitted Contract</u>"), Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract and all Cure Amounts (if any) for such Previously Omitted Contract.  Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Transferred" or "Excluded" (a "<u>Previously Omitted Contract</u>

Designation"). A Previously Omitted Contract designated in accordance with this <u>Section 1.5(c)</u> as "Excluded," or with respect to which Purchaser fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract for all purposes under this Agreement. If, on the other hand, Purchaser designates a Previously Omitted Contract as "Assumed" in accordance with this Section 1.5(c), <u>Schedule 1</u> shall be amended to include such Previously Omitted Contract (each, a "<u>New Transferred Contract</u>") and Sellers shall serve a notice (the "<u>Previously Omitted Contract Notice</u>") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Amounts with respect to such Previously Omitted Contract and Purchaser's intention to assume, and Seller's intention to assign, such Previously Omitted Contract in accordance with this <u>Section 1.5</u>. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fourteen (14 ) calendar days following the date of service of such Previously Omitted Contract Notice, which date will be set forth in the Previously Omitted Contract Notice, to file an objection (a "<u>Previously Omitted Contract Objection</u>") with the Bankruptcy Court to the proposed Cure Amounts or the assignment and assumption of such Previously Omitted Contract. If the counterparties to such Previously Omitted Contract, Sellers and Purchaser are unable to reach a consensual resolution with respect to the objection, (i) to the extent the Sale Hearing has not yet occurred, the matter will be heard at the Sale Hearing and (ii) to the extent the Sale Hearing has already occurred, Sellers will seek an expedited hearing before the Bankruptcy Court (a "<u>Previously Omitted Contract Hearing</u>") to determine the Cure Amounts, if any, and approve the assumption of such Previously Omitted Contract.

(c)     Sellers shall give written notice to Purchaser prior to the submission by Sellers of any motion in its Bankruptcy Case to assume or reject any Contract that is related to the Purchased Assets, together with a copy of the proposed order, and such motion and order shall be in form and substance acceptable to Purchaser; <u>provided</u> that (i) in no event shall Sellers seek to reject, or reject, any Contract prior to the Closing Date, unless prior written approval has been obtained from Purchaser and (ii) Sellers shall not seek to reject, or reject, any Contract (or any amendment or modification thereto that is acceptable to Purchaser in its sole discretion) that is a Transferred Contract.

(d)     At Closing: (i) Sellers shall, pursuant to the Approval Order and the Assignment and Assumption Agreement, assign to Purchaser each of the Transferred Contracts that are capable of being assumed and assigned, and (ii) pay or cause to be paid, pursuant to Section 365 of the Bankruptcy Code and the Approval Order, all Cure Amounts relating to the assignment and assumption of the Transferred Contracts, if any.

(e)     From the Agreement Date until Closing, Sellers shall not collect any Accounts Receivable relating to the Transferred Contracts or the New Transferred Contracts.

(f)     To the extent that Sellers receive any payments to be applied to any Accounts Receivable relating to the Transferred Contracts or the New Transferred Contracts, Sellers shall deposit and hold the payments in a segregated account (the "<u>Segregated Account</u>"). The funds in the Segregated Account shall be a Purchased Asset and title to the Segregated Account shall pass to the Purchaser according to the terms of this Agreement.

1.6     <u>Closing</u>. Unless this Agreement is terminated pursuant to <u>Article VI</u>, the closing of the transactions contemplated hereunder (the "<u>Closing</u>") shall take place remotely via the electronic exchange of documents on December 18, 2025 (the "<u>Target Closing Date</u>"); <u>provided</u> that, if all conditions in <u>Article V</u> to be satisfied at or prior to the Closing have not yet been satisfied or waived in writing by Sellers or Purchaser (as applicable) by the Target Closing Date, then, subject to the Parties' rights under <u>Article VI</u>, the Closing shall occur (a) within five (5) Business Days following the day on which the last of the conditions set forth in <u>Article V</u> are satisfied or waived (other than those conditions that by their nature are

to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions) or (b) on such other date as the Parties hereto may mutually agree (such date of the Closing being herein referred to as the "Closing Date"). The effective time of the Closing for Tax, operational and all other matters shall be deemed to be 11:59 p.m. Central Time on the Closing Date.

1.7    Purchase Price.

(a)    Purchase Price. On the terms and subject to the conditions in this Agreement, as consideration for the Purchased Assets, at the Closing, Purchaser shall pay to Sellers for the benefit of each of the Sellers an aggregate amount in cash of $3,310,000.00, less any Accounts Receivable collected and consumed by a Seller prior to the Closing Date (the "Purchase Price").

(b)    Allocation of Purchase Price. As soon as practicable (but in any event within sixty (60) calendar days) after the Closing, Purchaser shall deliver to Sellers for their review a statement (the "Allocation Statement") that allocates the Purchase Price among the Purchased Assets in accordance with the principles of Section 1060 of the Code and the regulations thereunder (the "Allocation"). Sellers shall have fifteen (15) days following receipt of the Allocation to review and comment on such proposed allocation and Purchaser shall consider such comments in good faith. Thereafter, Purchaser shall provide Sellers with Purchaser's final allocation schedule and Purchaser and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation. Neither Purchaser nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable Law.

1.8    Title Passage; Delivery of Purchased Assets.

(a)    Title Passage. Upon the Closing, all of the Sellers' right, title and interest in and to all of the Purchased Assets shall pass to Purchaser. Sellers shall convey the Purchased Assets to Purchaser and Sellers shall deliver to Purchaser (i) possession of the Purchased Assets and (ii) proper assignments, conveyances and bills of sale sufficient to convey to Purchaser all of Sellers' right, title and interest in and to the Purchased Assets, free and clear of Liens, Claims and Encumbrances to the extent provided in the Approval Order.

(b)    Method of Delivery of Assets; Transfer Taxes. The Purchased Assets shall be delivered to Purchaser in the form and to the location reasonably determined by Purchaser before the Closing Date at Purchaser's cost and expense; provided that, to the extent commercially practicable, Sellers shall deliver that portion of the Purchased Assets, including all software and software documentation, through electronic transmission or in another manner reasonably calculated and legally permitted to minimize or avoid the incurrence of Transfer Taxes if such method of delivery does not adversely affect the condition, operability or usefulness of any Purchased Asset so delivered.

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Each Seller represents and warrants, as of the Agreement Date and as of the Closing Date, to Purchaser as follows:

2.1    Organization, Standing, Power. Each Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. Each Seller has all requisite power and authority to own, operate and lease its properties and to conduct its business and is duly qualified to do business and is in good standing in each jurisdiction where the failure to be so qualified or in good

standing, individually or in the aggregate with any such other failures, would not reasonably be expected to have a material adverse effect on the Sellers or their respective businesses, taken as a whole.

2.2     Authority; Non-contravention.

(a)     The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Sellers are parties and the consummation of the Transactions have been duly authorized by all necessary corporate action on the part of each Seller. Each of this Agreement has been duly executed and delivered by Sellers and each of the Ancillary Agreements to which a Seller is a party will be duly and validly and delivered by such Seller at the Closing. This Agreement and when so executed the Ancillary Agreements to which Sellers are parties, subject to requisite approval of the Bankruptcy Court, will constitute valid and binding obligations of such Sellers, enforceable against Sellers in accordance with their respective terms, subject only to the effect, if any, of (i) applicable bankruptcy and other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

(b)     Subject to the entry of the Approval Order and such other authorizations as required by the Bankruptcy Court, the execution and delivery by Sellers of this Agreement and the Ancillary Agreements to which Sellers are party do not, and the consummation of the Transactions will not, (i) conflict with or result of a breach of the certificate of formation or bylaws, or similar organizational or governing documents of either Seller; (ii) violate any applicable Law applicable to the Sellers; or (iii) conflict with, or result in any violation of or default under any Contract applicable to Sellers related to the Purchased Assets, except in each case in clauses (ii) and (iii) above, where such violation would not reasonably be expected to have a material adverse effect on the business taken as a whole.

(c)     Except for the entry of the Approval Order and such other authorizations as required by the Bankruptcy Court, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person is required by or with respect to the Sellers in connection with the execution and delivery of this Agreement or Ancillary Agreements to which a Seller is a party, or the consummation of the Transactions that would reasonably be expected to adversely affect the ability of each Seller to consummate the Transactions.

2.3     Title to Purchased Assets. At the Closing, Sellers will assign, convey, transfer, grant, and deliver to Purchaser title to the Purchased Assets free and clear of all Liens, Claims and Encumbrances except the Permitted Liens and the Assumed Liabilities, and will provide to Purchaser the final Approval Order in a form satisfactory to Purchaser.

2.4     Material Contracts.   Transferred Contracts are "Material Contracts."   Sellers have previously delivered or made available to Purchaser a true and complete example of each Material Contract (including any and all amendments and modifications thereto).  Neither Sellers nor, to the Knowledge of Sellers, any other Person is in material breach or default thereunder, and, to the Knowledge of Sellers, no event has occurred that with notice or lapse of time, or both, would constitute a material breach or default, or permit termination, waiver or modification in any manner adverse to Sellers or their respective businesses or acceleration thereunder. No Person has asserted or has (except by operation of Law) any right to offset, discount, or otherwise abate any amount owing under any Transferred Contract, except as expressly set forth in such Transferred Contract.

2.5     Financial Statements. Copies of the Seller's financial reports prepared and filed during the Bankruptcy Case (the "Financial Statements"), have been delivered to Purchaser. The Financial Statements

fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

2.6     <u>Undisclosed Liabilities</u>. Sellers have no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Financial Statements, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Agreement Date and which are not, individually or in the aggregate, material in amount.

2.7     <u>Compliance with Laws</u>. Sellers are in compliance with all Laws applicable to the Business and/or the Purchased Assets.

2.8     <u>Real Property</u>. <u>Schedule 2.8</u> sets forth each parcel of real property owned by any Seller and used in or necessary for the conduct of the Business as currently conducted (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "<u>Owned Real Property</u>"), including with respect to each property, the address location and use. Sellers have delivered to Purchaser copies of the deeds and other instruments (as recorded) by which Sellers acquired such parcel of Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of Sellers with respect to such parcel. With respect to each parcel of Real Property:

(a)     Seller has good and marketable fee simple title, free and clear of all Liens and Encumbrances, except Permitted Liens;

(b)     Sellers have not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof;

(c)     there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein;

(d)     Seller has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof;

(e)     no work has been performed or is in progress upon, and no materials have been furnished to, the Owned Real Property or any part thereof, which might give rise to any mechanic's, material or other liens against the Owned Real Property or any part thereof;

(f)     Sellers have not received any notice of any change pending or contemplated in any applicable Laws, ordinances or restrictions, or of any judicial or administrative action or of any action by adjacent landowners, or any natural or artificial condition upon or affecting the Owned Real Property, or any portion thereof, which would result in any material adverse change in the condition of the Owned Property or which would prevent, limit, impede or render more costly Purchaser's use of the Owned Real Property in a manner consistent with Seller's use of the Owned Real Property immediately prior to the Closing;

(g)     Sellers have not received any notices from any insurance company of any defects or inadequacies in the Owned Real Property which would materially and adversely affect the insurability of the Owned Real Property or the premiums for the insurance on the Owned Real Property;

(h)    Seller and the Owned Real Property are in compliance with all applicable Laws, ordinances, regulations, statutes, rules, conditions, agreements, declarations and restrictions pertaining to and affecting the Owned Real Property, or any portion thereof;

(i)    there is no pending or threatened condemnation or similar Action affecting the Owned Real Property or any portion thereof, and, to the Knowledge of the Seller, no such Action is presently contemplated;

(j)    there are no Actions, or any proposed or threatened Actions, to change such zoning classification or land use plan or the conditions applicable to the Owned Real Property;

(k)    there exists no violation of any requirement or condition to such zoning classification or land use plan which is applicable to all or any portion of the Owned Real Property;

(l)    there are no service contracts, maintenance contracts, equipment contracts or operating agreements in existence with respect to the Owned Real Property and which will burden or affect the Owned Real Property after Closing;

(m)    no assessments have been made against the Owned Real Property that are unpaid (except ad valorem taxes for the current year), whether or not they have become Encumbrances;

(n)    there are water, sewer and electrical lines and surface drainage systems on the Owned Real Property which have been completed, installed and paid for and which are sufficient to fully service the present operations of the Owned Real Property for its current purpose and use;

(o)    no sewer or water moratorium is in effect with respect to the Owned Real Property that would prevent use of the Owned Real Property by Purchaser; and

(p)    the Owned Real Property has never been used as a landfill or garbage dump.

2.9    Intellectual Property. To the knowledge of Sellers, no Person is infringing on the Intellectual Property Rights.

2.10    Permits. All permits required for Sellers to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Sellers and are valid and in full force and effect. All fees and charges with respect to such permits as of the date hereof have been paid in full. Schedule 2.10 lists all current permits issued to Sellers which are related to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, including the names of the permits and their respective dates of issuance and expiration. Sellers have complied and are now complying with the terms of all permits listed on Schedule 2.10. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any permit set forth in Schedule 2.10.

2.11    Accounts Receivable. The Accounts Receivable: (a) have arisen from bona fide transactions entered into by Sellers involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Sellers not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; and (c) are collectible in full. Between the

Agreement Date and the Closing, no Seller has invoiced or otherwise attempted to collect any amounts due under the Transferred Contracts, including but not limited to the Unpaid A/R.

2.12    <u>Legal Proceedings</u>. Other than the Bankruptcy Cases, there are no claims, actions, suits, investigations, or other legal proceedings pending or, to Seller's knowledge, threatened against or by Seller relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities, save and except for the Disclosed Litigation.

2.13    <u>No Warranties</u>. EXCEPT AS SET FORTH IN THIS AGREEMENT, NEITHER OF THE SELLERS, NOR ANY OTHER PERSON, HAS MADE OR MAKES ANY REPRESENTATION OR WARRANTY WHATSOEVER TO PURCHASER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY MATTER RELATING TO THE SELLERS' ASSETS (INCLUDING WITH RESPECT TO THE PURCHASED ASSETS), LIABILITIES OR OPERATIONS (INCLUDING WITH RESPECT TO THE BUSINESS), INCLUDING WITH RESPECT TO THE MERCHANTABILITY OR FITNESS OF ANY PARTICULAR PURPOSE AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY DISCLAIMED AND NONE SHALL BE IMPLIED BY LAW OR IN EQUITY.

**ARTICLE III**
**<u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>**

Purchaser represents and warrants to each Seller, as of the Agreement Date and the Closing Date, as follows:

3.1    <u>Organization, Standing and Power</u>. Purchaser will be formed as a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. Purchaser has all requisite power and authority to own, operate and lease its properties and to conduct its business and is duly qualified to do business and is in good standing in each jurisdiction where the failure to be so qualified or in good standing, individually or in the aggregate with any such other failures, would not reasonably be expected to have a material adverse effect with respect to the ability of Purchaser to perform timely its obligations under this Agreement.

3.2    <u>Authority; Non-contravention</u>.

(a)    Purchaser has all requisite company power and authority to enter into this Agreement and the Ancillary Agreements to which Purchaser is a party and to consummate the Transactions. The execution and delivery of this Agreement and the Ancillary Agreements to which Purchaser is a party and the consummation of the Transactions have been duly authorized by all necessary company action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser. This Agreement and Purchaser constitutes, and when executed by Purchaser the Ancillary Agreements to which Purchaser is a party will constitute, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, subject only to the effect, if any, of (i) applicable bankruptcy and other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

(b)    The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements to which Purchaser is a party do not, and the consummation of the Transactions will not, conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or require any consent, approval or waiver from any Person pursuant to, (i) any provision of the

certificate of formation or bylaws, or similar organizational or governing documents, of Purchaser, as amended to date, or (ii) any applicable Law (except as would not reasonably be expected to have a material adverse effect on Purchaser).

(c)     Except for the entry of the Approval Order and such other authorizations as required by the Bankruptcy Court, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person is required by or with respect to Purchaser in connection with the execution and delivery of this Agreement or Ancillary Agreements to which Purchaser is a party, or the consummation of the Transactions that would reasonably be expected to adversely affect the ability of Purchaser to consummate the Transactions.

3.3     Financial Capacity. Purchaser has or will have as of the Closing sufficient cash at the time of Closing available to pay the Purchase Price on the terms and conditions contained herein.

3.4     Purchased Assets "AS IS"; Certain Acknowledgements.  Purchaser hereby acknowledges and agrees that, except as otherwise provided in this Agreement, (i) Purchaser is purchasing the Purchased Assets on an "AS IS, WHERE IS BASIS" and "WITH ALL FAULTS" basis based solely on purchaser's own investigation of the Purchased Assets and (ii) neither the Sellers nor any of the Sellers' representatives has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the purchased assets, any part of the purchased assets, the financial performance of the Purchased Assets or the Business, or the physical condition of the Purchased Assets. Purchaser further acknowledges that the consideration for the Purchased Assets has been agreed upon by the Sellers and Purchaser after good-faith, arms-length negotiations. Purchaser agrees, warrants and represents that, except as set forth in this Agreement, Purchaser has relied, and shall rely, solely upon its own investigation of all such matters, the terms and provisions of the Approval Order, and Purchaser assumes all risks with respect thereto.

## ARTICLE IV
## ADDITIONAL AGREEMENTS

4.1     Actions Pending Closing.

(a)     From the Agreement Date until the earlier of the Closing Date and termination of this Agreement pursuant to Article VI (the "Pre-Closing Period"), each Seller shall:

(i)     continue to operate and conduct its business in the ordinary course of business and in material compliance with applicable Law;

(ii)     in each case to the extent related to the Purchased Assets or the Assumed Liabilities, use its commercially reasonable efforts consistent with past practice and policies to preserve intact its present business organizations, and preserve its relationships with customers, suppliers, distributors, licensors, and licensees with respect to the Transferred Contracts, to the end that the goodwill of the Purchased Assets shall be unimpaired at the Closing;

(iii)     promptly notify Purchaser of any change, occurrence or event not in the ordinary course of business, or of any change, occurrence or event that, individually or in the aggregate with any other changes, occurrences and events, would reasonably be expected to be materially adverse to the Purchased Assets or cause any of the conditions set forth in Article V not to be satisfied; and

(iv)    notify (A) Purchaser in writing promptly after learning of any Action by or before any Governmental Entity or arbitrator initiated by or against it with respect to the Purchased Assets, or, to the Knowledge of Sellers, threatened against the Purchased Assets (a "New Litigation Claim"), (B) Purchaser of ongoing material developments in any New Litigation Claim or any litigation claim pending against the Sellers or the Purchased Assets as of the Agreement Date and (C) consult in good faith with Purchaser regarding the conduct of the defense of any New Litigation Claim or any litigation claim pending against the Purchased Assets as of the Agreement Date.

(b)    Except as required by applicable Law or the Bankruptcy Court or as otherwise required under the terms of this Agreement, during the Pre-Closing Period, without the prior written consent of Purchaser, neither Seller shall take any of the following actions with respect to the Purchased Assets or the Assumed Liabilities:

(i)    transfer, sell, lease, license or otherwise convey or dispose of, abandon or allow to lapse (other than at the expiration by its non-extendable and non-renewable term), or subject to any Lien (other than Permitted Liens), the Purchased Assets (or assets or property that would have been Purchased Assets, but for such transfer or disposition);

(ii)    enter into, renew, modify, amend or terminate any Transferred Contract relating to the Purchased Assets; or

(iii)    enter into any agreement to do any of the foregoing.

(c)    If either Seller desires to take an action that would be prohibited pursuant to Section 4.1(a) or Section 4.1(b) without the prior written consent of Purchaser, prior to taking such action, such Seller may request such written consent by sending an electronic mail to the representative of Purchaser, and Purchaser may deliver to Seller its written consent, which may not be unreasonably withheld, via electronic mail.

4.2    Access to Information. During the Pre-Closing Period, Sellers shall permit Purchaser and its authorized agents or Representatives to have reasonable access during regular business hours to: (i) such properties, books, records, Contracts and financial (including working papers) and operating data of the Purchased Assets or the Assumed Liabilities and (ii) members of management of the Sellers knowledgeable about the Purchased Assets or the Assumed Liabilities, in each case as Purchaser may reasonably request in order to review information and documentation and ask questions relative to the properties, books, Contracts and other records of the Purchased Assets or the Assumed Liabilities and to conduct any other reasonable investigations, in each case for any reasonable business purpose relating to the consummation of the Transactions. Notwithstanding anything to the contrary in the foregoing, neither Seller shall be required to provide access to or disclose information where such access or disclosure would reasonably be expected to cause the waiver of any attorney-client privilege of such Seller or contravene any applicable Law or binding agreement of such Seller (provided that such Seller shall inform Purchaser as to the general nature of what is being withheld as a result of the foregoing and shall use its reasonable efforts to disclose such information in a way that would not waive such privilege or contravene any applicable Law or binding agreement, including by entering into a joint defense or similar agreement).

4.3    Confidentiality.  The Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by the Sellers to prospective bidders and that, except as prohibited herein, such disclosure shall not be deemed to violate any confidentiality obligations owing to the Purchaser, whether pursuant to this Agreement or otherwise. The Sellers acknowledge and agree that from and after the Closing, all non-public information relating to the business

of Sellers, including the Purchased Assets and the Assumed Liabilities, shall be valuable and proprietary to the Purchaser and its Affiliates. The Sellers agree that, from and after the Closing, no Seller shall, and the Sellers shall cause any Seller Representative not to, disclose to any Person any information relating to the Purchaser and its Affiliates, or the business of Sellers, including the Purchased Assets and the Assumed Liabilities, except as required by Law or as otherwise becomes available in the public domain other than through any action by any Seller in violation of its obligations under this Section 4.3; provided that the Sellers shall use their commercially reasonable efforts, consistent with such applicable Law requirement to consult with the Purchaser with respect to the text thereof to the extent practicable. The Sellers acknowledge and agree that the remedies at law for any breach or threatened breach of this Section 4.3 by any Seller or its Affiliates is inadequate to protect the Purchaser and its respective Affiliates and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to the Purchaser or its Affiliates, each party acknowledges and agrees that upon any breach or threatened breach by a Seller or an Affiliate of the terms and conditions of this Section 4.3, the Purchaser and its Affiliates, as applicable shall be entitled to immediate injunctive relief and to an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 4.3 shall survive the Closing and terminate one-hundred and twenty (120) days after the Closing Date.

4.4     Press Release.  Prior to Closing, Purchaser and Sellers may only issue a press release or make a public statement concerning this Agreement and the Transactions if such press release or public statement is made in form and substance, and at a time, to which all other parties have consented after good faith consultation, subject to Sellers' obligations arising in the Bankruptcy Case.  Other than the foregoing, prior to Closing, no party hereto shall make any public disclosure concerning this Agreement, the Transactions, or the existence of and/or particulars of any negotiations related hereto, including the terms, conditions, consideration to be paid or other facts related to this Agreement, except to the extent that public disclosure is required by applicable Law or is otherwise made to a Governmental Entity or the Bankruptcy Court.

4.5     Sale Process; Bankruptcy Court Matters.

        (a)     From and after the execution of this Agreement until the Bankruptcy Court enters an order approving Purchaser as the stalking horse bidder for the Purchased Assets or, if earlier, the termination of this Agreement in accordance with its terms, Sellers agree that they shall not, and shall not permit any of their respective Affiliates or Related Parties to, and they shall instruct their respective Representatives not to, directly or indirectly, (i) solicit, initiate or take any action to facilitate or encourage the submission of any offer, proposal or inquiry to be the stalking horse bidder in place of Purchaser, (ii) furnish any non-public information relating to Sellers or their respective businesses or any of the Purchased Assets or afford access to any properties, assets, books or records of Sellers to, or otherwise knowingly assist, participate in, facilitate or encourage any effort by, any third party that, to the Knowledge of Sellers, is considering or seeking to be the stalking horse bidder, (iii) enter into or participate in any discussions or negotiations relating to any Alternative Transaction with any third party that is considering or seeking to be the stalking horse bidder except as required by the Bankruptcy Court, or (iv) enter into any agreement in principle, letter of intent, term sheet, merger agreement, acquisition agreement, option agreement or other similar instrument relating to a stalking horse bid with any party other than Purchaser (subsections (i) through (iv) collectively, the "Solicitation Actions").  Further, from and after the execution of this Agreement until the Bankruptcy Court enters an order approving Purchaser as the stalking horse bidder for the Purchased Assets, Sellers and their respective Affiliates, Related Parties and Representatives, shall not continue or engage in any Solicitation Actions. It is agreed that any violation of these restrictions as to Solicitation Actions set forth in this Section 4.3(a) by Sellers or any of their respective Affiliates, Related

Parties or Representatives shall be a breach of this <u>Section 4.5(a)</u> by Sellers. As used herein, the term "<u>Related Parties</u>" means, collectively, Sellers' Affiliates or any of Sellers' and such Affiliates' respective officers, directors, managers, partners, employees or direct or indirect equity owners.

(b)     Subject to compliance with <u>Section 4.5(a)</u>, this Agreement and the Transactions contemplated hereby are subject to Sellers' right and ability to consider higher and better competing bids with respect to their respective businesses and a material portion of the Purchased Assets subject to any applicable terms of this Agreement and the Sale Procedures Order. Pursuant to the Sale Procedures Order, Purchaser agrees to serve as a back-up bidder if the Sellers determine, in accordance with the Sale Procedures Order, that this Agreement represents the second highest bid for any of the Purchased Assets (the "<u>Back-up Bidder</u>") and keep Purchaser's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be modified with the written consent of Purchaser in any auction under the Approval Order, the "<u>Auction</u>") open and irrevocable until the earlier of (i) 5:00 p.m. (Central Time) on December 29, 2025 (the "<u>Outside Back-up Date</u>") (unless extended in writing by Purchaser) and (ii) the date of closing of an Alternative Transaction with the bidder who prevails at the Auction (the "<u>Prevailing Bidder</u>"). Following the Sale Hearing and prior to the Outside Back-up Date, if a bidder other than Purchaser is the Prevailing Bidder and such Prevailing Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, and if Purchaser has been designated as the Back-up Bidder, Purchaser will be deemed to have the new prevailing bid, and Sellers will be authorized, without further order of the Bankruptcy Court, to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be modified with the written consent of Purchaser in the Auction) with Purchaser.

(c)     No later than the first Business Day following the Petition Date, Sellers shall file (i) an order (the "<u>Sale Procedures Order</u>"), in form and substance acceptable to Purchaser, approving, among other things, the procedures in connection with (A) Sellers' request to sell, transfer and assign, as applicable, the Purchased Assets to Purchaser pursuant to this Agreement and Section 363 of the Bankruptcy Code, free and clear of all Liens, Claims and Encumbrances in or on the Purchased Assets to the fullest extent of the Bankruptcy Court's authority to so order (the "<u>Proposed Sale</u>"), (B) establishing notice and service requirements to all creditors and parties in interest of the Proposed Sale and the Sale Hearing, (C) approving Purchaser as a stalking horse bidder, (D) approving the payment of the Break-Up Fee in accordance with <u>Section 6.2(b)</u> of this Agreement, (E) establishing a deadline for the submission of competing bids for the Purchased Assets and (F) establishing thresholds for the initial overbid (which shall be at least $200,000) and bids thereafter (which shall be at least $50,000), the bidding procedures and setting a date for the Sale Hearing, all of which must be in form and substance acceptable to Purchaser (collectively, the "<u>Sale Procedures</u>"), and which shall be substantially in the form agreed by the Parties in writing and approved by the Bankruptcy Court; and (ii) a motion seeking the approval of the Proposed Sale which must be in form and substance acceptable to Purchaser (the "<u>Sale Motion</u>").

(d)     Sellers shall file a motion requesting the Bankruptcy Court to hold a hearing relating to the Sale Motion (the "<u>Sale Hearing</u>"), which will include requesting a hearing on the entry of the Approval Order, within three (3) Business Days after the Petition Date.

(e)     The order approving the Proposed Sale (the "<u>Approval Order</u>") must be in form and substance acceptable to Purchaser (including typical findings that the Purchaser is a good faith purchaser for value and entitled to the protections under § 363(m) of the Code, that the Purchased Assets will be free and clear of all Liens, Claims, and Encumbrances including successor liability claims, that Purchaser may receive assignment of any and all designated Transferred Contracts, etc.), and shall be substantially in the form attached hereto as <u>Exhibit B</u>.

(f)     Subject to Sellers' obligations to comply with any order of the Bankruptcy Court (including the Sale Procedures), Sellers and Purchaser will promptly make any filings, take all actions and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for the consummation of the Transactions.

4.6     Employee Matters.

(a)     Sellers will not hire any employees of Purchaser. Purchaser shall have no liability with respect to any employment liabilities of Sellers.

(b)     During the Pre-Closing Period, Sellers shall make available to Purchaser or its designated Affiliate each of the Seller Service Providers so that Purchaser or its Affiliate may interview such individuals with respect to potential post-Closing employment or engagement. Purchaser or its Affiliate may, but shall not be required to, offer to employ or engage, as applicable, those Seller Service Providers of its choosing, which offers: (i) shall be for employment or engagement commencing immediately after the Closing and (ii) may be subject to pre-hire screening processes. No later than two (2) Business Days prior to Closing, Purchaser shall inform Sellers which of those Seller Service Providers have received, and which have accepted, offers of employment or engagement with Purchaser or its Affiliate. Such Seller Service Providers who become employees or contractors of Purchaser or its Affiliate immediately after the Closing shall be collectively referred to as the "Transferred Service Providers." Effective as of the Closing, Sellers agree to terminate the employment of all of the Transferred Service Providers. Sellers shall waive, or cause to be waived, all non-competition, non-solicitation, non-disclosure, and other restrictions that would prevent or limit any Transferred Service Provider from becoming employed by, or performing any services for, Purchaser or any of its Affiliates.

(c)     Nothing expressed or implied in this Section 4.6 will confer upon any Seller Service Provider or any legal representative of any such Person, any rights or remedies, including any right to employment or engagement or continued employment or engagement for any specified period. Nothing in this Agreement (i) will limit or restrict in any way the right of Purchaser or its Affiliates to modify, amend, terminate or establish any Purchaser employee benefit plans or arrangements in whole or in part at any time after the Closing Date, (ii) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement of Purchaser, or (iii) is intended to confer upon any individual (including Seller Service Providers, retirees, or dependents or beneficiaries of Seller Service Providers or retirees) any right as a third- party beneficiary of this Agreement.

4.7     Tax Matters.

(a)     All Transfer Taxes shall be paid by the Sellers when due, and the Sellers shall, at their own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

(b)     Sellers, on the one hand, and Purchaser, on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other party (the "Paying Party"), all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of Section 4.7(c). Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and each party's respective liability therefor; provided that a failure to provide such notice will not relieve the Reimbursing Party from its liability hereunder except to the extent that the Reimbursing Party is materially prejudiced thereby. Any amounts which become payable from Sellers to Purchaser pursuant to Section 4.7(c) shall be entitled to a super-priority administrative expense claim against Sellers with a priority greater than any and all other

-15-

administrative expense claims against Sellers, including any administrative expense claims of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

(c)    All Taxes that arise out of the ownership or operation of the Purchased Assets or the Assumed Liabilities attributable to any Tax period or that portion of any Straddle Period, in each case ending on or prior to the Closing Date (the "Pre-Closing Straddle Period"), shall be attributable to and paid by the applicable Seller consistent with the cash collateral budget approved by the Bankruptcy Court, and Purchaser shall not be obligated to pay any such Taxes due or owing for any Tax period (or portion thereof) ending on or prior to the Closing Date. All Taxes that arise out of the ownership or operation of the Purchased Assets or the Assumed Liabilities attributable to any Tax period or that portion of a Straddle Period, in each case that begins after the Closing Date, shall be attributable to and paid by Purchaser. In the case of any Taxes that arise out of the ownership or operation of the Purchased Assets or the Assumed Liabilities for a Straddle Period, the portion of such Taxes that are allocated to the Pre-Closing Straddle Period shall be (i) in the case of Taxes imposed on a periodic basis (such as real or personal property Taxes), the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction, the numerator of which is the number of calendar days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period and (ii) in the case of Taxes not described in clause (i) (such as franchise Taxes or Taxes that are based on or related to income or receipts), the amount of any such Taxes shall be determined as if such taxable period ended as of the close of business on the Closing Date.

(d)    The Parties hereto shall reasonably cooperate with each other in the filing of any Tax Returns and the conduct of any audit or other Action. They each shall execute and deliver such powers of attorney and make available such other documents as are reasonably necessary to carry out the intent of this Section 4.7.

4.8    Collection of Accounts Receivable.

(a)    The total amount of Accounts Receivable with respect to the Transferred Contracts (excluding the New Transferred Contracts) as of the Agreement Date are estimated to be $522,651.22 (the "A/R Balance").

(b)    From the Agreement Date, unless this Agreement is terminated pursuant to Article VI, no Seller will collect or otherwise attempt to enforce collection with respect to any Accounts Receivable owed to a Seller pursuant to a Transferred Contract or New Transferred Contract, including but not limited to the A/R Balance.

(c)    As of the Closing Date, each Seller hereby (i) authorizes Purchaser to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Purchaser if received on or after the Closing Date and (ii) appoints Purchaser or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Purchaser after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Purchaser after Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Purchaser's own account.

(d)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Purchaser after Closing, as the case may be, shall be held in trust by such Seller for Purchaser's benefit and account, and promptly upon receipt

by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Purchaser or its designee the amount of such payments.

(e)    As of the Closing Date, Purchaser shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed, goods sold, or services provided by Purchaser after Closing, including but not limited to the A/R Balance.

## ARTICLE V
## CONDITIONS AND CLOSING DELIVERIES

5.1    <u>Conditions to Obligations of Purchasers</u>. The obligations of Purchaser hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Purchaser):

(a)    The representations and warranties of Sellers contained in this Agreement shall have been and be true and correct as of the Agreement Date and/or as of the Closing Date as stated herein.

(b)    Each Seller will have performed and complied in all material respects with all of its covenants and obligations contained in this Agreement (to the extent that such covenants and obligations require performance by such Seller on or before the Closing).

(c)    Sellers shall have filed the Sale Procedures Order by no later than the first Business Day after the Petition Date.

(d)    The Bankruptcy Court shall have:

(i)    approved and entered the Sale Procedures Order and authorized the Sellers' entry into this Agreement by no later than fourteen (14) calendar days after the Agreement Date;

(ii)    conducted the Sale Hearing no later than forty-eight (48) calendar days after the Agreement Date, unless the Sale Hearing is delayed on account of the Bankruptcy Court's docket requirements or with the written consent of Purchaser; and

(iii)    entered the Approval Order no later than the earlier of: (A) December 29, 2025 or (B) thirty (30) calendar days after the Sale Hearing, unless the entry of the Approval Order is delayed on account of the Bankruptcy Court's docket requirements or with the written consent of Purchaser, which Approval Order shall have become a Final Order as of the Closing Date unless otherwise agreed to by Purchaser in writing.

(e)    No Action shall be pending or threatened before any Governmental Entity that seeks to or does, and no Law shall be in effect that does, prevent consummation of any of the Transactions or otherwise makes such Transactions illegal.

(f)    Sellers shall have delivered to Purchaser each of the following:

(i)    the Bill of Sale duly executed by Sellers;

(ii)    the Assignment and Assumption Agreement duly executed by Sellers;

(iii)    a certificate executed by a duly authorized officer of each of Sellers certifying that the conditions in Sections 5.1(a) and 5.1(b) have been satisfied;

(iv)    a general warranty deed conveying good, insurable and marketable title to the Owned Real Property and all easements appurtenant thereto to Purchaser PropCo, subject only to the Permitted Liens, which general warranty deed shall be in statutory form for recording, duly executed by Property Owner; and

(v)    evidence of termination of that certain Laurel Events / Boxwood Hospitality Master Service Agreement dated September 15, 2018.

5.2    <u>Conditions to Obligations of Sellers</u>. The obligations of Sellers hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Sellers):

(a)    The representations and warranties of Purchaser contained in this Agreement shall have been and be true and correct as of the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such earlier date).

(b)    Purchaser will have performed and complied in all material respects with all of its covenants and obligations contained in this Agreement (to the extent that such covenants and obligations require performance by such Seller on or before the Closing).

(c)    The Bankruptcy Court shall have entered the Approval Order, which shall be in full force and effect and Sellers shall have obtained from the Bankruptcy Court all applicable orders, approvals, and consents required to transfer the Purchased Assets and to consummate the Transactions;

(d)    No Action shall be pending or threatened before any Governmental Entity that seeks to or does, and no Law shall be in effect that does, prevent consummation of any of the Transactions or otherwise makes such Transactions illegal.

(e)    Purchaser shall have delivered to Sellers each of the following:

(i)    an amount equal to the Purchase Price to an account designated in writing by Sellers;

(ii)    the Bill of Sale duly executed by Purchaser;

(iii)    the Assignment and Assumption Agreement duly executed by Purchaser; and

(iv)    A certificate executed by a duly authorized officer of Purchaser certifying that the conditions in Sections 5.2(a) and 5.2(b) have been satisfied.

## ARTICLE VI
## TERMINATION

6.1    <u>Events of Termination</u>. This Agreement may be terminated and the Transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)    by mutual written consent of Sellers and Purchaser;

(b)    by Purchaser, if the Closing shall not have occurred by the Outside Date or, if the Purchaser is the Back-Up Bidder, the Outside Back-Up Date; <u>provided</u> that Purchaser shall have the right (but not the obligation), by written notice to Sellers on or prior to the Outside Date, to extend the Outside Date for up to an additional sixty (60) calendar days;

(c)    by Sellers, if there has been a material breach of any covenant or condition or any representation or warranty of Purchaser at any time after the Target Closing Date and Sellers have notified Purchaser of such breach in writing, and the breach has not been cured (if capable of being cured) within 10 Business Days after delivery of such notice (and if not capable of being cured, immediately);

(d)    by Purchaser, if there has been a material breach of any covenant or condition or any representation or warranty of Sellers at any time after the Target Closing Date and Purchaser has notified Sellers of such breach in writing, and the breach has not been cured (if capable of being cured) within five (5) Business Days after delivery of such notice (and if not capable of being cured, immediately);

(e)    by either Sellers or Purchaser, if there shall be any Law of any Governmental Entity that makes consummation of the Transactions illegal or otherwise prohibited or if any judgment, injunction, order or decree of any competent authority prohibiting such Transactions is entered and such judgment, injunction, order or decree shall have become final and non-appealable;

(f)    by Purchaser, if any of the provisions of <u>Section 5.1(d)</u> are not satisfied by the Outside Date; or;

(g)    by either Sellers or Purchaser if an Alternative Transaction is approved by the Bankruptcy Court and consummated.

6.2    <u>Effect of Termination</u>.

(a)    In the event that this Agreement shall be terminated pursuant to <u>Section 6.1</u>, all further obligations of the Parties hereto under this Agreement shall terminate without further liability or obligation of any party hereto to the other party hereunder, except for those provisions that expressly survive the termination of this Agreement and as provided in this <u>Section 6.2.</u> A party shall not be released from liability hereunder, subject to the express provisions of this Agreement, if this Agreement is terminated and the Transactions abandoned by reason of (i) the willful and intentional failure of such party to have performed its obligations hereunder or (ii) any knowing misrepresentation made by such party of any matter set forth herein. Notwithstanding the foregoing, the provisions of <u>Section 4.2(b)</u>, this <u>Section 6.2</u> (including, for the avoidance of doubt, all obligations of Sellers and entitlement of Purchaser with respect to bid protections, including the Break-Up Fee) and <u>Article VII</u> of this Agreement shall remain in full force and effect and the Parties hereto shall remain bound by and continue to be subject to the provisions thereof.

(b)    If this Agreement is terminated by either Sellers or Purchaser pursuant to <u>Section 6.1(g)</u>, then Sellers shall pay Purchaser within two Business Days of the consummation of an Alternative

Transaction an amount equal to 5% of the Purchaser's initial bid for the Purchased Assets (the "Break-Up Fee").

(c)    Purchaser shall not be entitled to the Break-Up Fee if the Transactions as contemplated in this Agreement closes with Purchaser.  This Agreement is entered into as a stalking horse bid.  Purchaser's participation in this Agreement shall be deemed to have generated a material benefit to the Sellers' estates if the Sellers entered into an Alternative Transaction that results in the termination of this Agreement pursuant to Section 6.1(g).  Accordingly, the Break-Up Fee shall be deemed an actual and necessary cost and expense of preserving Sellers' estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall constitute allowed administrative expense claims against Sellers that shall not be subject to impairment or discharge until paid in full in Seller's chapter 11 case and shall be payable from any available source of funds, including the proceeds of any Alternative Transaction.

## ARTICLE VII
## GENERAL PROVISIONS

7.1    Survival and Indemnity. The Parties agree that the representations and warranties contained in this Agreement and the Ancillary Agreements shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof except for fraud.  The Parties further agree that the covenants contained in this Agreement and the Ancillary Agreements to be performed at or after the Closing shall survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified herein, and each party hereto shall be liable to the other party after the Closing for any breach thereof.

7.2    Further Assurances. The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties hereto, except as may be herein specifically provided to the contrary; provided that, at the request of either Sellers or Purchaser, the other party or Parties shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement and the Transactions.

7.3    Notices. Any notice, request, or demand desired or required to be given hereunder will be in writing and will be given by personal delivery, email delivery, or overnight courier service, in each case addressed as respectively set forth below or to such other address as any party will have previously designated by such a notice. The effective date of any notice, request, or demand will be the date of personal delivery, the date on which email is sent (provided that the sender of such email does not receive a written notification of delivery failure) or one day after it is delivered to a reputable overnight courier service, as the case may be, in each case properly addressed as provided herein and with all charges prepaid.

(a)    if to Purchasers:

Enchanted Way Operating LLC, and
Enchanted Way Ventures LLC
c/o Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Attn: Austin Hill
Email: austin.hill@wickphillips.com
]

with copies (which shall not constitute notice) to:

Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Attn: Austin Hill; Scott Lawrence
Email: austin.hill@wickphillips.com; scott.lawrence@wickphillips.com

(b)    if to Sellers:

KellyBain Events, LLC
Laurel Events, LLC, and
WOC Events Grapevine, LLC
1804 Market Center Blvd.
Dallas, Texas 75207

with copies (which shall not constitute notice) to:

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
Attention: Thomas Berghman; Jacob King
E-mail: tberghman@munsch.com; jking@munsch.com
Telephone No.: (214) 855-7500

7.4    Interpretation; Rules of Construction.

(a)    The Parties hereto have been represented by counsel during the negotiation, preparation and execution of this Agreement and the Ancillary Agreements and, therefore, hereby waive, with respect to this Agreement, any Ancillary Agreement and each Exhibit and each Schedule attached hereto or thereto, the application of any Law or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(b)    The words "hereof", "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole (including any exhibits, appendices and schedules to this Agreement) and not to any particular provision of this Agreement. The words "include", "including" or "includes" when used herein shall be deemed in each case to be followed by the words "without limitation" or words having similar import. The phrases "provided to," "furnished to," "made available" and phrases of similar import when used herein, unless the context otherwise requires, shall mean that a true, correct and complete copy of the information or material referred to has been physically or electronically provided to the party to whom such information or material is to be provided. The headings and table of contents in this Agreement are included for convenience of reference only and will not limit or otherwise affect the meaning or interpretation of this Agreement. Unless the context of this Agreement otherwise requires: (i) words of any gender include each other gender, (ii) words using the singular or plural number also include the plural or singular number, respectively, (iii) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement, (iv) references to clauses without a cross-reference to a Section or subsection are references to clauses within the same Section or, if more specific, subsection, (v) references to any Person include the successors and permitted assigns of that Person and (vi) references from or through any date shall mean, unless otherwise specified, from and including or through and including, respectively. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends and such phrase shall not mean simply "if."

Unless indicated otherwise, (A) any action required to be taken by or on a day or Business Day may be taken until 11:59 p.m. Central Time on such day or Business Day, (B) all references to "days" shall be to calendar days unless otherwise indicated as a "Business Day" and (C) all days, Business Days, times and time periods contemplated by this Agreement will be determined by reference to Central Time.  Unless indicated otherwise, all mathematical calculations contemplated by this Agreement shall be rounded to the tenth decimal place, except in respect of payments, which shall be rounded down to the nearest whole U.S. cent.

(c)      Any reference in this Agreement to wire transfers or other payments requires payment in Dollars unless otherwise expressly stated in that reference.  Any amounts to be converted into Dollars for the purpose of calculating any amounts under this Agreement shall be converted into Dollars at the applicable exchange rate published by the Wall Street Journal on the immediately preceding day.

7.5      Severability. If any provision of this Agreement shall be declared by any Law or public policy to be illegal, invalid or unenforceable, all other provisions of this Agreement and the application of such provision to other persons or circumstances other than those which it is determined to be illegal, void or unenforceable, shall not be impaired or otherwise affected and shall remain in full force and effect to the fullest extent permitted by applicable Law, and Sellers and Purchaser shall negotiate in good faith to replace such illegal, void or unenforceable provision with a provision that corresponds as closely as possible to the intentions of the Parties as expressed by such illegal, void or unenforceable provision.

7.6      Amendments; Waiver. This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed by Sellers and Purchaser.  No waiver by any party hereto of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving.  Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, or a failure or delay by any party in exercising any power, right or privilege under this Agreement shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained herein, or in any documents delivered or to be delivered pursuant to this Agreement or in connection with the Closing hereunder.  The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

7.7      Entire Agreement. This Agreement, together with the Ancillary Agreements, and the schedules hereto and thereto and the instruments referred to herein and therein, supersede all of other prior oral or written agreements among the Parties solely with respect to the matters contained herein and therein, and this Agreement, together with the Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein, constitute the entire understanding of the parties solely with respect to the matters contained herein in therein.

7.8      Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, and nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity  not a party to this  Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Sellers or the Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided that (a) the Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of its Affiliates and (b) the Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court.  No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations.  Upon any such permitted assignment, the references in this

Agreement to the Sellers or the Purchaser shall also apply to any such assignee unless the context otherwise requires.

7.9     <u>Governing Law</u>.   All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal Laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Texas.

7.10     <u>JURISDICTION; WAIVER OF JURY TRIAL</u>. WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE TRANSACTIONS, OR ANY OF THE DOCUMENTS ENTERED INTO IN CONNECTION HEREWITH OR FOR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH COURT. EACH OF THE PARTIES AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND BINDING ON SUCH PARTY. EACH PARTY TO THIS AGREEMENT HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY RELATED TRANSACTION.

7.11     <u>Expenses</u>. Except as otherwise provided in this Agreement, each of the Parties shall pay its own expenses in connection with this Agreement and the transactions contemplated here by, including legal and accounting fees and commissions or finder's fees, whether or not the transaction contemplated hereby are consummated; <u>provided</u> that this paragraph shall not affect Purchasers right to any Expense Reimbursement or Sellers' right under <u>Section 6.2</u>.

7.12     <u>Attorneys' Fees</u>. If any party hereto brings an action or other proceeding to enforce or interpret the terms of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses including without limitation all court costs and reasonable attorneys' fees as the prevailing party may suffer and incur in pursuit or defense of such action or proceeding.

7.13     <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties hereto and delivered to the other Parties hereto; it being understood that all Parties hereto need not sign the same counterpart. The delivery by facsimile or by electronic delivery in PDF format of this Agreement with all executed signature pages (in counterparts or otherwise) shall be sufficient to bind the Parties hereto to the terms and conditions set forth herein. All of the counterparts will together constitute one and the same instrument and each counterpart will constitute an original of this Agreement.

SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF, each of the undersigned Parties has caused this Asset Purchase Agreement to be executed and delivered as of the date first written above.

PURCHASER:

ENCHANTED WAY OPERATING LLC

By: _Austin B. Hill_

Name: Austin B. Hill

Title:  Authorized Person

ENCHANTED WAY VENTURES LLC

By: _Austin B. Hill_

Name: Austin B. Hill

Title:  Authorized Person

SELLERS:

KELLYBAIN EVENTS, LLC

By: _____

Name: Turner Bain

Title: manager

LAUREL EVENTS, LLC

By: _____

Name: Thomas Bain

Title: manager

WOC EVENTS GRAPEVINE, LLC

By: _____

Name

Title:

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

**EXHIBIT A**

**DEFINITIONS**

As herein, the following terms shall have the meanings indicated below:

"<u>Accounts Receivable</u>" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, including (x) any such Accounts Receivable generated by Sellers between the Agreement Date and the Closing Date and (y) any amounts received by or payable to Sellers with respect to the Accounts Receivable, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"<u>Action</u>" means any action, claim, proceeding, litigation, charge, grievance, arbitration, mediation, suit, order, consent decree, fine, penalty, demand, complaint, consent decree, notice of actual, potential, or probable violation, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), including any request for information, or any appeal therefrom or any demand letter threatening the initiation of any of the foregoing.

"<u>Affiliate</u>" has the meaning set forth in Section 101(2) of the Bankruptcy Code and shall include, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity whether through ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Agreement Date</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Allocation Statement</u>" has the meaning set forth in <u>Section 1.7(b)</u>.

"<u>Alternative Transaction</u>" means a transaction consummated with a Prevailing Bidder or sponsor under a chapter 11 Plan that is not Purchaser pursuant to an order of the Bankruptcy Court in the Bankruptcy Case, whether under Bankruptcy Code Section 363, or via a plan of reorganization.

"<u>Ancillary Agreements</u>" means the Bill of Sale and the Assignment and Assumption Agreement.

"<u>Approval Order</u>" has the meaning set forth in <u>Section 4.5(e)</u>.

"<u>Assignment and Assumption Agreement</u>" means that certain Assignment and Assumption Agreement entered into between Purchaser and Sellers in the form attached hereto as <u>Exhibit C</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 1.3</u>.

"<u>Auction</u>" has the meaning set forth in <u>Section 4.5(b)</u>.

"<u>Back-up Bidder</u>" has the meaning set forth in <u>Section 4.5(b)</u>.

"<u>Bankruptcy Case</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Code, beginning 11 U.S.C. § 101 *et seq.*, as amended from time to time.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plan" means any plan providing for compensation, severance, termination pay, deferred compensation, performance awards, stock or stock-related awards, fringe benefits or other employee benefits or remuneration of any kind including each "employee benefit plan" within the meaning of Section 3(3) of ERISA which is or has been maintained, contributed to, or required to be contributed to, by either of the Sellers or any of its ERISA Affiliates for the benefit of any employee or with respect to which Sellers or any of its ERISA Affiliates have or may have any liability or obligation,

"Bill of Sale" means that certain Bill of Sale of Sellers in favor of the Purchaser in the form attached hereto as Exhibit D.

"Business Day" means a day (i) other than Saturday or Sunday and (ii) on which commercial banks are open for business in Dallas, Texas.

"Break-Up Fee" has the meaning set forth in Section 6.2(b).

"Cash Equivalents" means all cash on hand and in banks, cash equivalents, marketable securities, short-term investments, treasury bills, money orders, checks, deposit account balances, instruments for the payment of money, certificates of deposit and other time deposits or letters of credit.

"Claim" has the meaning set forth in Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, recoupment rights, obligations, and liabilities of any kind or nature under any contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 1.6.

"Closing Date" has the meaning set forth in Section 1.6.

"Contract" means any written or oral legally binding contract, agreement, instrument, commitment or undertaking of any nature (including leases, licenses, mortgages, notes, guarantees, sublicenses, subcontracts and purchase orders), including all amendments, supplements, exhibits and schedules thereto.

"Cure Amount" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under any Transferred Contracts so that they may be sold and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code, as such amounts may be adjusted, if applicable, by agreement between Purchaser and the counterparty or counterparties to such Transferred Contracts.

"Disclosed Litigation" means the following lawsuits: (i) *Idea 247, Inc. v. Laurel Events LLC* pending in the Tarrant County District Court Cause No. 236-370475-25, and (ii) *Tarrant County v. WOC Events Grapevine LLC* pending in the Tarrant County District Court for the 348th Judicial District Cause No. 348-D46385-25.

"Documents" means all files, documents, reports, records, databases, photographs, letters, customer and supplier lists, technical documentation, development plans, including with respect to the proposed bridge and adjacent land, user documentation, marketing documentation, quality control records and procedures, blueprints, all consumer and supplier files and documentation, supplier lists, records, literature and correspondence, including materials related to services, marketing, advertising, promotional materials, and other similar materials to the extent related to, used in, or held for use in, the Purchased

A-2

Assets, but excluding any materials exclusively related to Excluded Assets or Excluded Liabilities or subject to a claim to attorney-client privilege, as well as any documents prepared by Sellers in connection with this Agreement, any Ancillary Agreements or the Bankruptcy Case.

"Dollars" or "$," when used in this Agreement or any other agreement or document contemplated hereby, means U.S. dollars unless otherwise stated.

"Encumbrance" means any encumbrance, mortgage, deed of trust, Claim, Action, Liability, interest, security interest, defect, irregularity, pledge, charge, burden, or Lien of any kind and character.

"Excluded Assets" has the meaning set forth in Section 1.2.

"Excluded Contracts" has the meaning set forth in Section 1.2(e).

"Excluded Liabilities" has the meaning set forth in Section 1.4.

"Expense Reimbursement" has the meaning set forth in Section 6.2(b)1.7(a).

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, the operation or effect of which has not been reversed, stayed, modified, amended, vacated or supplemented and as to which order or judgement the time to appeal or seek review, rehearing, reargument or certiorari has expired and as to which no appeal or petition for review, rehearing, reargument or certiorari has been filed and remains pending.

"Governmental Entity" means any supranational, national, state, municipal, local or foreign government, any court, tribunal, arbitrator, administrative agency, commission or other governmental official, authority or instrumentality, in each case whether domestic or foreign, any stock exchange or similar self-regulatory organization or any quasi-governmental or private body exercising any regulatory, Taxing or other governmental or quasi-governmental authority (including any governmental or political division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"Indebtedness" of any Person means, without duplication, (i) indebtedness for borrowed money, whether current or funded, secured or unsecured, including that evidenced by notes, bonds, debentures or other similar instruments (and including all outstanding principal, prepayment premiums, if any, and accrued interest, fees and expenses related thereto), (ii) any obligations owed with respect to letters of credit, performance or surety bonds, bankers' acceptances and similar facilities (in each case, to the extent drawn), (iii) any cash overdrafts, (iv) all obligations of such Person for the deferred purchase price of property or services and all obligations of such Person under any conditional sale or other title retention agreement (but excluding trade accounts payable and other accrued current liabilities) and (v) any outstanding guarantees of obligations of the type described in clauses (i) through (iv).

"Intellectual Property" means any and all of the following and all rights in, arising out of, or associated therewith, throughout the world: (i) patents, utility models, and applications therefor and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof, and equivalent or similar rights in inventions and discoveries anywhere in the world, including invention disclosures, common law and statutory rights associated with trade secrets, confidential and proprietary information, and know how, industrial designs and any registrations and applications therefor, (ii) trade names, logos, trade dress, trademarks and service marks, trademark and service mark registrations, trademark and service mark applications, and any and all goodwill associated with and

A-3

symbolized by the foregoing items, (iii) Internet domain name applications and registrations, Internet and World Wide Web URLs or addresses, (iv) copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto, and economic rights of authors and inventors, however denominated, and any similar or equivalent rights to any of the foregoing.

"KellyBain" has the meaning set forth in the introductory paragraph hereof.

"Knowledge" with respect to the Sellers means, with respect to any fact, circumstance, event or other matter in question, the knowledge of such fact, circumstance, event or other matter after reasonable inquiry the executive officers of Sellers.

"Laurel" has the meaning set forth in the introductory paragraph hereof.

"Law" means any federal, state, foreign, local, municipal or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling, order, writ, injunction, award, judgment or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"Liabilities" mean all debts, liabilities, commitments and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, liquidated or unliquidated, asserted or unasserted, known or unknown, whenever or however arising, including those arising under applicable Law or any Action or order of a Governmental Entity and those arising under any Contract, regardless of whether such debt, liability, commitment or obligation would be required to be reflected on a balance sheet prepared in accordance with generally accepted accounting principles or disclosed in the notes thereto.

"Lien" has the meaning of that term as set forth in section 101(37) of the Bankruptcy Code and includes all mortgages, leases (other than real property leases), options, liens, charges, burdens, encumbrances, pledges, security interests, and charging orders and any other encumbrances, whether vested or contingent, that evidence or secure a debt or payment obligation or adverse ownership interest in the property or rights in question, whether imposed by agreement, understanding, law, equity or otherwise, or liens or encumbrances both now existing or hereafter arising that would encumber any of the Purchased Assets arising under any agreement binding on Sellers or their respective property or arising from any act of Sellers or arising pursuant to any right, title, lien, or encumbrance that could hereafter be asserted as a result of the transfer of the Purchased Assets by Sellers to Purchaser with any such lien to attach solely to the proceeds of sale contemplated herein.

"Material Contracts" has the meaning set forth in Section 2.4.

"New Litigation Claim" has the meaning set forth in Section 4.1(a)(iv)1.7(a).

"New Transferred Contract" has the meaning set forth in Section 1.5(b).

"Offer Letter" has the meaning assigned to it in the recitals.

"Outside Back-Up Date" has the meaning set forth in Section 4.5(b).

"Outside Date" means December 29, 2025, unless further extended by Purchaser pursuant to Section 6.1(b); provided that, if Purchaser is the Back-Up Bidder, the Outside Date shall be the Outside Back-Up Date.

"<u>Paying Party</u>" has the meaning set forth in <u>Section 4.7(b)</u>.

"<u>Permitted Liens</u>" means Liens or Encumbrance which will be released and discharged pursuant to the Approval Order.

"<u>Person</u>" means any natural person, company, corporation, limited liability company, general partnership, limited partnership, trust, proprietorship, joint venture, business organization or Governmental Entity.

"<u>Plan</u>" means a chapter 11 plan or reorganization or liquidation filed in the Bankruptcy Case.

"<u>Plan Effective Date</u>" means the date on which no stay of any order of the Bankruptcy Court confirming a Plan is in effect, all conditions precedent to the effectiveness of such Plan have been satisfied or waived, and such Plan becomes effective.

"<u>Pre-Closing Period</u>" has the meaning set forth in <u>Section 4.1(a)</u>.

"<u>Pre-Closing Straddle Period</u>" has the meaning set forth in <u>Section 4.7(c)</u>.

"<u>Prevailing Bidder</u>" has the meaning set forth in <u>Section 4.5(b)</u>.

"<u>Previously Omitted Contract</u>" has the meaning set forth in <u>Section 1.5(b)</u>.

"<u>Previously Omitted Contract Designation</u>" has the meaning set forth in <u>Section 1.5(b)</u>.

"<u>Previously Omitted Contract Hearing</u>" has the meaning set forth in <u>Section 1.5(b)</u>.

"<u>Previously Omitted Contract Notice</u>" has the meaning set forth in <u>Section 1.5(b)</u>.

"<u>Previously Omitted Contract Objection</u>" has the meaning set forth in <u>Section 1.5(b)</u>.

"<u>Property Owner</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 1.7(a)</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 1.1</u>.

"<u>Purchased Intellectual Property</u>" has the meaning set forth in <u>Section 1.1(a)</u>.

"<u>Purchaser</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Reimbursing Party</u>" has the meaning set forth in <u>Section 4.7(b)</u>.

"<u>Related Parties</u>" has the meaning set forth in <u>Section 4.5(a)</u>.

"<u>Representatives</u>" means, with respect to any Person, the directors, managers, officers, employees, financial advisors, attorneys, accountants, consultants, agents, and other authorized representatives of such Person.

"<u>Sale Hearing</u>" has the meaning set forth in <u>Section 4.5(d)</u>.

A-5

"Sale Motion" has the meaning set forth in Section 4.5(c).

"Sale Procedures" has the meaning set forth in Section 4.5(c).

"Sale Procedures Order" has the meaning set forth in Section 4.5(c).

"Segregated Account" has the meaning set forth in Section 1.5(f).

"Seller Service Providers" means all employees and independent contractors of Sellers.

"Seller Registered Intellectual Property" means the United States, international and foreign: (i) patents and patent applications (including provisional applications); (ii) registered trademarks, applications to register trademarks, intent-to-use applications, or other registrations or applications related to trademarks; (iii) registered Internet domain names; and (iv) registered copyrights and applications for copyright registration; registered or filed in the name of, either Seller.

"Sellers" has the meaning set forth in the introductory paragraph hereof.

"Solicitation Actions" has the meaning set forth in Section 4.5(a).

"Straddle Period" means any taxable period that begins on or before the Closing Date and ends after the Closing Date.

"Target Closing Date" has the meaning set forth in Section 1.6.

"Tax" (and, with correlative meaning, "Taxes" and "Taxable") means (i) any net income, alternative or add on minimum tax, gross income, estimated, gross receipts, sales, use, ad valorem, value added, transfer, franchise, capital stock, profits, license, registration, withholding, payroll, social security (or equivalent), employment, unemployment, disability, excise, severance, stamp, occupation, premium, property (real, tangible or intangible), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount (whether disputed or not) imposed by any Governmental Entity responsible for the imposition of any such Tax (domestic or foreign) (each, a "Tax Authority"), (ii) any liability for the payment of any amounts of the type described in clause (i) of this sentence as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group for any Taxable period, and (iii) any liability for the payment of any amounts of the type described in clause (i) or (ii) of this sentence as a result of being a transferee of or successor to any Person or as a result of any express or implied obligation to assume such Taxes or to indemnify any other Person.

"Tax Return" means any return, statement, report or form (including estimated Tax returns and reports, withholding Tax returns and reports, any schedule or attachment, and information returns and reports) filed or required to be filed with respect to Taxes.

"Third Party Intellectual Property" means Intellectual Property owned by a third party.

"Transactions" means, collectively, the transactions contemplated by this Agreement and any Ancillary Agreement.

"Transfer Taxes" means all sales, transfer, bulk sales, stamp, or use Taxes arising from the transfer of the Purchased Assets from Sellers to Purchaser contemplated by this Agreement.

A-6

"<u>Transferred Contracts</u>" has the meaning set forth in <u>Section 1.5(a)</u>.

"<u>Transferred Service Providers</u>" has the meaning set forth in Section 4.6(b).

4928-1921-3430v.1
4900-0405-1831v.1

**EXHIBIT B**

**FORM OF APPROVAL ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| WOC EVENTS GRAPEVINE, LLC[1] | § | Case No. 25- |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

**ORDER GRANTING DEBTORS' MOTION TO SELL SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

CAME ON FOR CONSIDERATION the *Debtor's Motion to Sell Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests* (the "Sale Motion," or "Motion")[2] filed by Laurel Events, LLC ("Events"), WOC Events Grapevine, LLC ("Grapevine"), and KellyBain Events, LLC ("Boxwood," and collectively with Events and Grapevine, the "Debtors"), the debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy cases (the "Bankruptcy Cases"), requesting the entry of this Order (the "Sale Order") authorizing and approving (A) the asset purchase agreement attached hereto as **Exhibit A** (together with any

---

[1]    The Debtors in these chapter 11 bankruptcy cases, along with the last four digits of their federal tax identification number are: Laurel Events, LLC (6782); and WOC Events Grapevine, LLC (7344); and KellyBain Events, LLC (7171).  The Debtors' mailing address is: 1804 Market Center Blvd., Dallas, Texas 75207.

[2]    Terms capitalized but not defined herein shall have the meaning ascribed to them in the Motion.

- 1 -

other document(s) or modification as may be required and/or necessary to effectuate the transactions contained therein, the "APA") by and among (i) the Debtors, and (ii) Enchanted Way Operating LLC ("Operating") and Enchanted Way Ventures LLC ("Ventures," and collectively with Operating, the "Purchasers" or "Stalking Horse Purchasers"); (B) authorizing and approving the sale of substantially all of the Debtors' assets as set forth in the APA (the "Purchased Assets") to the Stalking Horse Purchasers on terms set forth in the APA (the "Sale"), free and clear of any and all Liens, Claims, Encumbrances, and Interests (as defined below); and (C) granting any necessary and additional related relief, all as more fully described in the Sale Motion.  The Debtors, having determined after a full, fair, and reasonable marketing process, that the Stalking Horse Purchasers have submitted the highest and otherwise best Qualified Bid or other bid for the Purchased Assets; and upon adequate and sufficient notice of the Sale Motion and the hearing on the Motion before the Court on December 10, 2025 (the "Sale Hearing"); and upon the Court having reviewed  and considered the Motion and all relief related thereto and the statements of counsel and evidence presented in support of the relief requested by the Debtors in the Sale Motion and at the Sale Hearing; and upon it appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, the creditors, and all parties in interest; and upon it appearing that this Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, and it appearing that the Motion is a core proceeding under 28 U.S.C. § 157; and upon adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed or with all objections having been resolved or overruled, as the case may be, and it appearing that no other notice need be given; and upon the

- 2 -

record of the Sale Hearing and all other pleadings and proceedings in these Bankruptcy Cases

including the Motion; and after due deliberation and good and sufficient cause appearing therefore,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.  **FED. R. BANKR. P. 7052**.  The findings of fact and conclusions of law herein

constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule

7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of fact are

conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of

fact, they are adopted as such.

B.  **Jurisdiction & Venue**. This Court has jurisdiction over this matter pursuant to

28 U.S.C. §§ 157 and 1334.  Without limiting the generality of the foregoing, this Court has

exclusive *in rem* jurisdiction over the Assets pursuant to 28 U.S.C. § 1334(e), as such Purchased

Assets are property of the Debtors' chapter 11 bankruptcy estate and, as a result of such

jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b) and, as such, this Court

has the authority to enter a final order.  Venue is proper in this Court under 28 U.S.C. §§ 1408 and

1409.

C.  **Statutory Predicates**.  The statutory predicates for the relief requested in the

Motion are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and the Local Bankruptcy Rules of the United States Bankruptcy Court for

the Northern District of Texas (the "Local Rules").

D.  **Notice**.  Proper and timely notice of the Sale Motion, Bid Procedures, and Sale

Hearing, as well as the proposed Sale contemplated thereby, have been provided to all known

- 3 -

parties entitled to notice thereof, in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all orders of the Court, and related certificates of service filed with the Court.

E.     **Opportunity to Object**.   The notices described in the foregoing paragraph and elsewhere in this Sale Order constitute good and sufficient notice under the particular circumstances, and no other or further notice need be given for the granting of the relief requested in the Sale Motion or the Court's entry of this Sale Order.  A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including (a) all potential purchasers previously identified or solicited by the Debtors and/or its advisors prior to and during these Bankruptcy Cases and all other potentially interested parties identified by the Debtors and/or its advisors in the Debtors' business judgment as a potential purchaser or broker for a potential purchaser; (b) all parties who are known to possess or assert any Liens, Claims, and Interests (defined below) in or upon any of the assets of the Debtors; (c) all applicable federal, state, and local governmental units (as defined in section 101(27) of the Bankruptcy Code, "Governmental Units") that have a reasonably known interest in the relief requested in the Sale Motion or the Sale set forth therein; and (d) all counterparties to the Transferred Contracts and/or other of the Debtors' executory contracts or unexpired leases.

F.     **Bid Procedures**.   On July XX, 2025, the Court entered the *Order Approving (A) Bid Procedures; and (B) Stalking Horse Protections* [Dkt. No. XX] (the "Bid Procedures Order"), thereby, among other things, approving the Bid Procedures (as defined in the Bid Procedures Order).  The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a

- 4 -

higher or otherwise better offer to purchase the Purchased Assets and represent the best method for maximizing the value of the Debtors' estates.  The Debtors conducted the sale process in good faith, without collusion, and in accordance with the Bid Procedures after a robust marketing process.

G.    **Sufficiency of Marketing**.  The Debtors and their advisors, including the Debtors' bankruptcy counsel employed in these Bankruptcy Cases, have conducted a fair and open sale process and have marketed the Purchased Assets to potential purchasers in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures, and Bid Procedures Order, and all other applicable orders of this Court, if any.  The sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, and commercially reasonable opportunity for any entity to make an offer to purchase the Purcased Assets, and the process conducted by the Debtors (with the assistance of its advisors) pursuant to the Bid Procedures Order and the Bid Procedures obtained the highest or best value for the Purchased Assets, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Purchased Assets and the Debtors' estates.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets or submit an objection to the proposed sale, transfer, assumption, and/or assignment of any Purchased Asset or Transferred Contract, as the case may be.  The marketing process undertaken by the Debtors and their advisors and each of the Debtors' respective agents and other representatives with respect to the Purchased Assets have been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all stakeholders in all respects.

4914-6275-6470v.3

H.     **Stalking Horse Purchasers' APA; Assets Property of the Estate**.  On October

31, 2025, the Debtors and the Stalking Horse Purchasers agreed to the terms of the APA.  The Sale

transaction contemplated by the APA constitutes a Qualified Bid and the Stalking Horse

Purchasers constitute Qualified Bidders, and ultimately the Successful Bidders, each in accordance

with the Bid Procedures.  The Purchased Assets the Debtors own and that the Debtors seek to sell

and assign to the Stalking Horse Purchasers under the APA are property of the Debtors' bankruptcy

estate pursuant to section 541 of the Bankruptcy Code, and title to the portion of the Purchased

Assets that belong to the Debtors is vested in the Debtors' estates.

I.     **Auction and Bidding Process**.  Based on the evidence presented during the Sale

Hearing, as well as the record in these Bankruptcy Cases, the Debtors have complied with the Bid

Procedures and Bid Procedures Order in all respects and has satisfied the applicable requirements

of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, as necessary for the Court to

grant the Sale Motion and enter this Sale Order, including the provisions set forth in the Bid

Procedures.

J.     **Corporate Authority**.  Subject to and giving effect to the entry of this Sale Order,

the Debtors (a) have full power and authority to execute the APA and all other documents

contemplated thereby; (b) have all of the power and authority necessary to consummate the Sale

transaction; and (c) have taken all corporate actions necessary to authorize and approve the APA

and any actions required to be performed by the Debtors to consummate the sale transaction.  No

consents or approvals of the Debtors (other than those expressly provided for in the APA or this

Sale Order) are required for the Debtors to consummate the Sale transaction, and any claim or

argument to the contrary by any party is hereby overruled or waived.

- 6 -

K.      **Sound Business Purpose**.  Entry into the APA and consummation of the Sale constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, the creditors, and all parties in interest.  This Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to the Stalking Horse Purchaser on the terms and conditions set forth in the APA. The Court finds that the relief sought in the Motion, including approval of the APA and other documents necessary to effectuate and consummate the Sale of the Purchased Assets to the Stalking Horse Purchaser as contemplated thereunder, is in the best interests of the Debtors' bankruptcy estates, the creditors, and all parties in interest.  The Debtors have demonstrated compelling circumstances and good, sufficient, and sound business purposes and justifications for consummating the Sale prior to, and outside of, a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code (a "Chapter 11 Plan" or "Plan").  The Debtors' decision to enter into the APA and consummate the Sale transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their managers, directors, and officers.  Because the Debtors' entry into the APA and consummation of the Sale constitutes the exercise by the Debtors of sound business judgment, the Debtors and their managers, directors, officers, advisors, professionals, agents, or representatives shall have or incur no liability or be otherwise subject to damages in any manner whatsoever either personally or to the Debtors' bankruptcy estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, fraud, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction.

- 7 -

L.      **Sale Highest or Best Offer**.  In addition to the Debtors' sound exercise of business judgment as to the Sale and the APA: (a) the total consideration provided by the Stalking Horse Purchaser for the Purchased Assets as reflected in the APA is the highest and/or best offer for the Purchased Assets; (b) the APA and the closing of the Sale provided for under the APA presents the best opportunity to realize the maximum value of the Purchased Assets and avoid a decline and devaluation of the Purchased Assets; (c) there is risk of deterioration of the value of the Purchased Assets if the Sale transaction is not consummated promptly; (d) the APA and the consummation of the Sale transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative; and (e) the Debtors' entry into the APA and consummation of the Sale transaction is reasonable and appropriate under the circumstances.  No other person, entity, or group of entities has offered to purchase the Purchased Assets for greater overall value to the Debtors' estate than the Stalking Horse Purchaser.

M.      **Arm's-Length Sale and Stalking Horse Purchasers' Good Faith**.  The APA was negotiated and is undertaken by the Debtors and Stalking Horse Purchasers at arm's length, without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m).  The Stalking Horse Purchasers recognize that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets and willingly subjected their bid to the Bid Procedures.  As a result of the foregoing, the Stalking Horse Purchaser is a "good faith purchaser" within the meaning of Bankruptcy Code section 363(m) and, as such, is entitled to all of the protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and the Stalking Horse Purchaser has proceeded in good faith in all respects in connection with the Sale transaction specifically and these Bankruptcy Cases generally.

N.      **No Fraudulent Transfer**.  The total consideration provided by the Stalking Horse Purchaser pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE ANN. § 24.004–006 (West 2019), and any other applicable law and may not be avoided under Bankruptcy Code section 363(n) or any other applicable law.  The APA was not entered into, and the Sale transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Purchaser have entered into the APA or are consummating the Sale transaction with any fraudulent or otherwise improper purpose.

O.      **Free and Clear Sale Required by the Stalking Horse Purchasers**.  If the Debtors did not sell the Purchased Assets free and clear of all Liens, Claims, Encumbrances, and Interests (defined below), to the extent provided in the APA and under section 363(f) of the Bankruptcy Code, such a sale would have yielded substantially lower value for the Debtors' bankruptcy estates, with less certainty than the Sale transaction.  The Stalking Horse Purchasers would not likely have submitted a bid or entered into the APA, and would likely not consummate the Sale transaction, thus adversely affecting the Debtors, their estate, and the creditors, if the Sale transaction and the assignment of the Purchased Assets, including the Transferred Contracts, to the Stalking Horse Purchasers were not free and clear of all Liens, Claims, Encumbrances, and Interests of any kind or nature whatsoever, to the extent provided in the APA.  Therefore, the Sale contemplated by the APA and approved herein free and clear of all the Liens, Claims, Encumbrances, and Interests is in the best interests of the Debtors, their estates, the creditors, and all other parties-in-interest.

P.      **Sale Free and Clear of Liens, Claims and Interests**.  The APA contemplates the

Sale of the Purchased Assets to the Stalking Horse Purchasers pursuant to the terms and conditions

set forth in the APA and this Sale Order.  The Sale of the Assets pursuant to the APA and this Sale

Order shall be free and clear of all liens (including any "lien" as defined in section 101(37) of the

Bankruptcy Code), interests, obligations, rights, encumbrances, pledges, mortgages, deeds of trust,

security interests, claims (including any "claim" as defined in section 101(5) of the Bankruptcy

Code), leases, possessory leasehold interests, charges, options, rights of first refusal or option to

purchase any real property, easements, servitudes, transfer restrictions under any agreement,

judgments, hypothecations, demands, licenses, sublicenses, assignments, debts, obligations,

guaranties, options, contractual commitments, restrictions, environmental liabilities, options to

purchase, and options, in each case of whatever kind, nature, or description in, against, or with

respect to any of the Assets, having arisen, existed or accrued prior to and through the date on

which the Sale closes, whether direct or indirect, absolute or contingent, choate or inchoate, fixed

or contingent, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement,

understanding, law, equity, statute, or otherwise and whether arising prior to, on, or after the

Petition Date ("Liens," "Claims," and/or "Interests," as applicable, and collectively, "Liens,

Claims, and/or Interests"), *except* for any such Liens, Claims, and/or Interests that, by the express

terms of the APA or this Sale Order, shall be preserved and remain attached to the Assets following

the Sale and conveyance of the Purchased Assets to the Stalking Horse Purchasers, if any

(collectively, "Permitted Encumbrances").  For the avoidance of doubt, the term(s) "Liens, Claims,

Encumbrances, and Interests," as used in this Sale Order, include, without limitation, the

following:

       i.      any rights, Liens, Claims, or Interests based on any successor or transferee
liability;

ii.      any Liens, Claims, Encumbrances, or Interests that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or termination of the Debtor's or the Purchaser's interest in the Assets, or any similar rights;

iii.     any mortgages, deeds of trust, and security interests;

iv.      any pension, multiemployer plan (as such term is defined in § 3(37) or § 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended "<u>ERISA</u>")), health or welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtor or any multi-employer plan to which the Debtor has at any time contributed to or had any liability or potential liability;

v.       any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and § 4980B of the Internal Revenue Code and of any similar state law, (ix) state discrimination laws, (x) state unemployment compensation laws or any other similar state laws, (xi) any other state or federal benefits or claims relating to any employment with the Debtors or any of its predecessors, or (xii) the WARN Act (29 U.S.C. §§ 2101 et seq.);

vi.      any bulk sales/transfers laws or similar laws;

vii.     any tax statutes or ordinances, including, without limitation, the Internal Revenue Code, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the date of the Sale closing, including, without limitation, any ad valorem taxes assessed by any applicable taxing authority;

viii.    any Contract that is not a Transferred Contract and all the Debtors' obligations thereunder; and

ix.      any Liens, Claims, or Interests that are not Assumed Liabilities (defined below) under the APA or this Sale Order.

For the avoidance of doubt, there are no Permitted Encumbrances under this Sale Order.

- 11 -

Q.    **Bankruptcy Code § 363(f)**.  The Debtors may sell its Purchased Assets free and clear of all Liens, Claims, Encumbrances, and Interests because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied with regard to each such Lien, Claim, Encumbrance, and Interest. The Court finds that the Purchase Price paid for the Purchased Assets exceeds the value of any liens encumbering the Purchased Assets in satisfaction of section 363(f)(3) of the Bankruptcy Code.  To the extent that the Purchase Price is not in excess of any liens, the senior secured lender on the Purchased Assets has consented to the sale and will be paid less than the value of their secured interests in the Purchased Assets.

R.    **Valid Transfer**.  As of the closing of the Sale under the APA (the "Closing"), pursuant and subject to the terms of the APA and this Sale Order, the Sale will effect a legal, valid, enforceable, and effective transfer of the Purchased Assets and will vest the Stalking Horse Purchasers with all of the Debtors' right, title, and interest in the Purchased Assets free and clear of all Liens, Claims, Encumbrances, and Interests with such Liens, Claims, Encumbrances, and Interests attaching to the proceeds from the Sale of the Purchased Assets (the "Sale Proceeds") with the same nature, validity, priority, extent, perfection, force and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Sale Order.

S.    **No Successor Liability**.  Neither the Stalking Horse Purchasers nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Stalking Horse Purchasers nor any of its affiliates shall assume, or in any way be responsible for, any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Liabilities, to the extent provided in the APA or this Sale Order.

- 12 -

T.      **Assets Assignable**.  The Debtors' interest in the Owned Real Property and all other

Purchased Assets are subject to assignment or sale free and clear of all Liens, Claims,

Encumbrances, and Interests in accordance with the terms and conditions of this Sale Order and

the APA.  Each and every provision of the documents governing the Purchased Assets or

applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be

construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if

any, have been, or will be following the entry of this Sale Order, satisfied in accordance with

applicable law or are otherwise unenforceable under section 365 of the Bankruptcy Code in respect

of the assignment of Assets pursuant to the Sale.  For the avoidance of doubt, and based on the

evidence presented, should any consent be conditioned on reasonableness, this Court finds a party's

failure to provide consent to the proposed assignment unreasonable given the circumstances.  If

Debtors and Stalking Horse Purchasers failed to obtain a necessary and unconditioned consent to

assignment that would otherwise preclude assignment as a matter of law, the Purchased Asset

subject to such assignment shall be treated in accordance with the terms and conditions of the

APA.

U.      **No Sub Rosa Plan**.  The APA and the Sale transaction do not constitute a *sub rosa*

Chapter 11 Plan for the Debtors.  The APA neither impermissibly restructures the rights of the

Debtors' creditors nor impermissibly dictates a Chapter 11 Plan for the Debtors.

V.      **Final Order**.  This Sale Order constitutes a final order within the meaning of

28 U.S.C. § 158(a), and the Court has the constitutional authority to enter a final order with respect

to the Motion.  Time is of the essence in consummating the Sale, and in order to maximize the

value of the Purchased Assets, it is essential that the sale and assignment of the Purchased Assets

occurs within the time constraints set forth in the APA and the Bid Procedures Order.

- 13 -

Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 7054, the Court expressly finds no just reason for delay in the implementation of this Sale Order, and expressly directs the immediate entry and effectiveness without stay of this Sale Order as set forth herein. The consummation of the Sale of the Assets to the Purchaser is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), and 365.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     **Objections Overruled**. To the extent that any objections to the Sale have not been withdrawn, waived, or settled, such objections and all reservations of rights included therein are hereby overruled on the merits. Any and all parties who did not object or who withdrew their objections to the Sale Motion or the Sale are hereby precluded from contesting the Sale contemplated under the APA pursuant to Bankruptcy Code sections 362(f)(3), and/or 365, or any other applicable provision of the Bankruptcy Code, and also pursuant to the Bid Procedures Order.

2.     **Sale Approval**. The relief requested in the Sale Motion, as implemented by the Bid Procedures Order, and the Sale of the Assets to the Purchaser pursuant to the APA is hereby **GRANTED** and **APPROVED** in its entirety. Pursuant to Bankruptcy Code sections 105 and 363 the APA and the Sale and conveyance of the Debtors' Purchased Assets to the Stalking Horse Purchasers as of the Closing are hereby approved, and the Debtors are authorized and directed to consummate the Sale, including the sale, assignment, conveyance and deliverance of all of the Debtors' right, title, and interest in the Purchased Assets to the Stalking Horse Purchaser free and clear of any and all Liens, Claims, Encumbrances, and Interests in accordance with the terms of

- 14 -

and subject to the satisfaction or waiver of the conditions to the Debtors' obligations to consummate the Sale set forth in the APA, with such Liens, Claims, Encumbrances, and Interests attaching to the Sale Proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Sale Order.  Notwithstanding the foregoing, the sale of the Purchased Assets to the Stalking Horse Purchasers shall not be free and clear of any and all Permitted Encumbrances as otherwise defined above.

3.      **Authority to Consummate Sale**.  Pursuant to Bankruptcy Code sections 105 and 363 the Debtors and the Stalking Horse Purchasers, as applicable, are each hereby authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale; (b) enter into the APA; (c) perform the obligations of the Debtors under the APA and any and all additional instruments and documents that may be contemplated by or reasonably necessary or desirable to implement the APA and consummate, implement, and close the Sale and any other transactions contemplated thereby prior to or after the Closing without further order of this Court; and (d) enforce the terms of this Sale Order.  The Stalking Horse Purchasers and the Debtors shall have no obligation to consummate the Sale except as is contemplated by and provided for in the APA.

4.      **Automatic Stay**.  The Stalking Horse Purchasers shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code section 362 to enforce any of its remedies under the APA or any other documents related thereto.  The automatic stay imposed by Bankruptcy Code section 362 is modified solely to the extent necessary to implement the provisions of this Sale Order and the Sale of the Purchased Assets to the Stalking Horse Purchasers.

5.      **Binding Effect**.  This Sale Order and the APA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any

- 15 -

holders of Liens, Claims, Encumbrances, or Interests in, against, or on all or any portion of the

Purchased Assets (whether known or unknown), the Stalking Horse Purchasers and their respective

successors and permitted assigns, notwithstanding the dismissal of any of the Debtors' case or any

subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in

this Case or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the APA

shall not be subject to rejection or avoidance under any circumstances.  If any order under

Bankruptcy Code section 1112 is entered and/or a liquidating trust is formed in these Bankruptcy

Cases, such order shall provide, or be deemed to provide (in accordance with Bankruptcy Code

sections 105 and 349) that all rights and obligations of the Debtors under this Sale Order and the

APA shall accrue to, and be for the benefit of, and shall be exercisable by, the estates, as provided

by any order of the Bankruptcy Court, and the estates shall be entitled to exercise all of the rights

of the Debtors under the APA.  The APA, this Sale Order, and the Debtors' obligations therein

and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by

any Chapter 11 Plan proposed or confirmed in the Bankruptcy Cases, any order confirming any

Chapter 11 Plan, or any subsequent order of this Court without the prior written consent of the

Stalking Horse Purchasers.  To the extent of any conflict between this Sale Order or the APA and

such future Plan or order, the terms of this Sale Order and the APA shall control.

6.     **Modifications**.   The APA and any related agreements, documents, or other

instruments in effect as of the date hereof may be modified, amended, or supplemented through a

written document signed by the parties thereto in accordance with the terms thereof without further

order of this Court; *provided, however*, that any such modification, amendment, or supplement

does not have a material adverse effect on the Debtors or their estates.

4914-6275-6470v.3

7.     **Sale Free and Clear**.   The Purchased Assets shall be sold and/or otherwise transferred to the Stalking Horse Purchasers at Closing free and clear of any and all Liens, Claims, Encumbrances, and Interests.  Any and all Liens, Claims, Encumbrances, and Interests related to the Purchased Assets shall attach solely to the Sale Proceeds with the same validity, enforceability, priority, and force and effect as they had against the Purchased Assets immediately prior to the Closing, and subject to the rights, claims, defenses, and objections, if any, of the Debtors (and/or its estate) and all parties in interest with respect to such Liens, Claims, Encumbrances, and Interests.  Notwithstanding the foregoing, the liens securing payment of the current-year ad valorem property taxes shall remain attached to the property to secure payment of all ad valorem property taxes assessed on the property for the current tax year and any penalties and interest that may accrue thereon, and the Permitted Encumbrances shall continue in full force and effect and remain attached to the Purchased Assets upon sale to the Stalking Horse Purchasers.

8.     **Injunction**.  Subject in each case to the terms and conditions of the APA, upon Closing, all parties holding claims (as defined in Bankruptcy Code section 101(5)) against the Debtors or their bankruptcy estates, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated, arising before the Closing or with Liens, Claims, Encumbrances, and Interests in or against the Purchased Assets existing before the Closing, shall be, and hereby are, with respect to any and all such Liens, Claims, Encumbrances, and Interests, permanently enjoined from: (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, the Stalking Horse Purchasers or the Purchased Assets, or any direct or indirect transferee of any of the Purchased Assets, or direct or indirect successor

- 17 -

in interest to, the Stalking Horse Purchasers; (b) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against the Stalking Horse Purchasers or the Purchased Assets or any direct or indirect transferee of any of the Purchased Assets, or direct or indirect successor in interest to, the Stalking Horse Purchasers; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any and all Liens, Claims, and Encumbrance of any kind against the Stalking Horse Purchasers or the Purchased Assets, or any direct or indirect transferee of any of the Purchased Assets, or successor in interest to, the Stalking Horse Purchasers; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Sale Order; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Sale Order.  The provisions of this paragraph shall not be applicable to any liability assumed under the APA or to claims or causes of action arising after Closing out of executory contracts assumed and assigned in accordance with the terms of the APA. This paragraph is intended to ensure that the Stalking Horse Purchasers are acquiring the Purchased Assets free and clear of all such Liens, Claims, Encumbrances, and Interests in accordance with section 363(f) of the Bankruptcy Code, and is intended to enjoin holders of such Liens, Claims, Encumbrances, and Interests from seeking to enforce those Liens, Claims, Encumbrances, and Interests against Stalking Horse Purchasers' Assets after Closing.

9.     **Transfer of Title**.  The Sale and transfer of the Purchased Assets pursuant to this Sale Order and the APA will vest the Stalking Horse Purchasers with valid and indefeasible title to the Purchased Assets, and will be a legal, valid, and effective sale and transfer of the Purchased Assets to the Stalking Horse Purchasers free and clear of any and all Liens, Claims, Encumbrances,

and Interests, with such Liens, Claims, Encumbrances, and Interests attaching to the Sale Proceeds

with the same nature, validity, priority, extent, perfection, force and effect that such Liens, Claims,

Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of

this Sale Order; *provided, however*, that, except as and to the extent expressly set forth in the APA,

the Debtors expressly disclaim any representation or warranty, express, statutory or implied, as to

title to any of the Purchased Assets.

10.     **Valid Transfer**.  Effective upon the Closing, the transfer to the Stalking Horse

Purchasers of the Debtors' right, title, and interest in the Purchased Assets pursuant to the APA

shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right,

title, and interest in the Purchased Assets, and vests with, or will vest in, the Stalking Horse

Purchasers all right, title, and interest of the Debtors in the Purchased Assets, free and clear of any

and all Liens, Claims, and Interests.  No bulk sales laws or any similar law of any state or other

jurisdiction shall apply in any way to the Sale transaction, the Motion, and this Sale Order.  The

terms of the APA are fair and reasonable, and the Sale transaction set forth therein shall be deemed

for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under

the Bankruptcy Code and any other applicable law.

11.     **No Successor Liability**.  Neither the Stalking Horse Purchasers nor any of their

affiliates are or shall be deemed, as a result of the consummation of the Sale transaction, to: (a) be

legal successors to the Debtors or their estates by reason of any theory of law or equity; (b) have,

de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation

or substantial continuation or successor of the Debtors in any respect.  Neither the Stalking Horse

Purchasers nor any of its affiliates shall assume or in any way be responsible for any liability or

- 19 -

obligation of any of the Debtors or their estates, other than the Assumed Liabilities, to the extent

provided in the APA or this Sale Order.

12.    **Release of Interests**.  Effective upon the Closing, this Sale Order: (a) is and shall

be effective as a determination that all Liens, Claims, Encumbrances, and Interests of any kind or

nature whatsoever existing as to the Purchased Assets prior to the Closing have been

unconditionally released, discharged, and terminated (with such Liens, Claims, Encumbrances,

and Interests attaching to the Sale Proceeds with the same nature, validity, priority, extent,

perfection, force and effect that such Liens, Claims, Encumbrances, and Interests encumbered the

Purchased Assets immediately prior to the entry of this Sale Order) and that the conveyances

described herein have been effected; and (b) is and shall be binding upon and shall govern the acts

of all entities, including all filing agents, filing officers, title agents, title companies, recorders of

mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental

departments or units, secretaries of state, federal, state and local officials and all other persons and

entities who may be required by operation of law, the duties of their office, or contract, to accept,

file, register or otherwise record or release any documents or instruments, or who may be required

to report or insure any title or state of title in or to the Purchased Assets conveyed to the Stalking

Horse Purchasers, and all recorded Liens, Claims, Encumbrances, and Interests against the

Purchased Assets shall be deemed stricken from such entities records, official and otherwise.

13.    **Approval to Release Interests**.  If any person or entity that has filed financing

statements, mortgages, mechanic's liens, or other documents or agreements evidencing Liens,

Claims, Encumbrances, or Interests against or on the Purchased Assets shall not have delivered to

the Debtors before the Closing, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of liens and easements, and any other

- 20 -

documents necessary for the purpose of documenting the release of all Liens, Claims, Encumbrances, and Interests that the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Stalking Horse Purchasers are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets. The Stalking Horse Purchasers are hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Encumbrances, and Interests. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

14.    **Surrender of Possession**. Any and all Purchased Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Stalking Horse Purchasers free and clear of all Liens, Claims, Encumbrances, and Interests with such Liens, Claims, Encumbrances, and Interests attaching to the Sale Proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Sale Order, and shall be delivered to the Stalking Horse Purchasers and deemed delivered at the time of Closing (or such other time as provided in the APA).

15.    **Allocation of Assets**. The Stalking Horse Purchasers are hereby authorized in connection with the consummation of the Sale transaction to allocate the Purchased Assets among its affiliates in a manner as it in its sole discretion deems appropriate, and to assign any of the Purchased Assets to its affiliates with all of the rights and protections accorded to the Stalking

- 21 -

4914-6275-6470v.3

Horse Purchasers under this Sale Order and the APA with respect thereto, in each case, to the extent permitted by, and in accordance with, the terms of the APA.

16.    **Exculpation**.  Because the entry into the APA and the other transaction documents, as well as the consummation of the Sale transaction, constitute the exercise by the Debtors of their sound business judgment, the Debtors and their respective managers, directors, officers, representatives, advisors, professionals or agents, shall neither have, nor incur, any liability or otherwise be subject to any damages whatsoever either personally or to the bankruptcy estate or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, fraud, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction pursuant to a final order.

17.    **Indemnification by Purchaser**.  From and after the Closing, the Stalking Horse Purchasers shall release, defend, indemnify and hold the Debtors and each of its respective managers, directors, officers, agents and successors harmless from and against any and all losses, liabilities, obligations, damages, costs and expenses based upon, attributable to or resulting from: (a) any breach of any representation or warranty of Stalking Horse Purchasers, as set forth in the APA, or any representation or warranty contained in any certificate delivered by or on behalf of Purchaser; (b) any breach of any covenant or other agreement on the part of Stalking Horse Purchasers under the APA; (c) the Assumed Liabilities; and (d) any other indemnity obligations of Stalking Horse Purchasers and its affiliates expressly set forth in the APA.

18.    **Prohibition of Actions Against Purchaser**.  Except for the Assumed Liabilities, or as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, the

- 22 -

Stalking Horse Purchasers and their affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein and in the APA, the Stalking Horse Purchasers and their affiliates shall not be liable for any claims against the Debtors, and the Stalking Horse Purchasers and their affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, successor or transferee liability, labor law, ERISA, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing.  Effective upon the Closing, with the sole exception of any enforcement of rights related to the Assumed Liabilities or as otherwise provided in the APA, all persons and entities shall be, and hereby are, forever barred and estopped from (a) taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Stalking Horse Purchasers in accordance with the terms of this Sale Order and the APA and (b) asserting, prosecuting, or otherwise pursuing, whether in law or in equity, in any judicial, administrative, arbitral or other proceeding, any Liens, Claims, Encumbrances, and/or Interests of any kind or nature whatsoever against the Stalking Horse Purchasers and its successors, designees, assigns, or property, or the Purchased Assets conveyed under this Sale Order in accordance with the APA.

19. **No Interference**.    Following the Closing, no holders of Liens, Claims, Encumbrances, and Interests in or against the Debtors or the Purchased Assets shall interfere with

- 23 -

the Stalking Horse Purchasers' title to or use and enjoyment of the Purchased Assets based on or related to any Liens, Claims, Encumbrances, and Interests.

20.     **Retention of Jurisdiction**.   This Court retains exclusive jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including retaining jurisdiction to: (a) compel delivery of the Purchased Assets or performance of other obligations owed to the Stalking Horse Purchasers; (b) compel performance of obligations owed to the Debtors; (c) resolve any disputes arising under or related to the APA or the Sale Transaction; (d) interpret, implement, and enforce the provisions of this Sale Order; (e) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Stalking Horse Purchasers to evidence the release of any Liens, Claims, Encumbrances, and Interests in or against  the Purchased Assets; (f) protect the Stalking Horse Purchasers and their affiliates against (i) any Liens, Claims, Encumbrances, and Interests in or against the Debtors or the Purchased Assets of any kind or nature whatsoever and (ii) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets that may be in its possession; and (g) protect the Debtors against any liabilities (other than any liabilities retained by the Debtors under the APA) in any way relating to the Purchased Assets arising on or after the Closing Date other than to the Stalking Horse Purchasers pursuant to the APA.

21.     **Immediate Effect**.   For good cause shown, this Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or other applicable law or procedural rules, and the provisions of this Sale Order shall be self-executing.   The Debtors and the Stalking Horse Purchasers are authorized to close the Sale

- 24 -

transaction immediately upon entry of this Sale Order and are authorized to satisfy the conditions

to Closing (as set forth in the APA), as soon as reasonably practicable.

22.    **Good Faith Purchaser**.    The Sale transaction contemplated by the APA is

undertaken by the Purchaser in good faith, as that term is used in Bankruptcy Code section 363(m),

and the Stalking Horse Purchasers have acted without collusion in undertaking the Sale transaction

contemplated by the APA.    Accordingly, the reversal or modification on appeal of the

authorization provided herein to consummate the Sale transaction shall not affect the validity of

the sale of the Purchased Assets to the Stalking Horse Purchasers (including the assumption and

assignment by the Debtors of any of Transferred Contracts), unless such authorization is duly

stayed pending such appeal.    The Stalking Horse Purchasers are buyers in good faith of the

Purchased Assets, and are entitled to all of the protections afforded by Bankruptcy Code § 363(m).

23.    **Inconsistencies with Prior Orders, Pleadings, or Agreements**.    To the extent of

any conflict between the APA and this Sale Order, the terms of the Sale Order shall govern.    To

the extent this Sale Order is inconsistent or conflicts with any prior order or pleading in these

Bankruptcy Cases, the terms of this Sale Order shall govern and any prior orders shall be deemed

amended or otherwise modified to the extent required to permit consummation of the Sale

transaction.

24.    **Subsequent Orders and Plan Provisions**.    Unless otherwise agreed to by the

Debtors and the Stalking Horse Purchasers, nothing contained in any Chapter 11 Plan of

reorganization or liquidation, or order of any type or kind entered in (a) these Bankruptcy Cases,

in (b) any subsequent Chapter 7 case into which any of these Bankruptcy Cases may be converted,

or in (c) any related proceeding subsequent to entry of this Sale Order shall conflict with or

derogate from the provisions of the APA (as modified by this Sale Order, if at all) or the terms of this Sale Order.

25.    **Failure to Specify Provisions**.  The failure to specifically reference any particular provisions of the APA or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

26.    **Satisfaction of Conditions Precedent**.  Neither the Stalking Horse Purchasers nor the Debtors shall have an obligation to close the Sale transaction until all conditions precedent in the APA to each of their respective obligations to close the Sale transaction have been satisfied or waived in accordance with the terms of the APA.

27.    **Provisions Non-Severable**.  The provisions of this Sale Order are non-severable and mutually dependent.

# # # END OF ORDER # # #

4914-6275-6470v.3

Submitted by:

Thomas D. Berghman
Texas Bar No. 24082683
Jacob J. King
Texas Bar No. 24136951
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard St., Ste. 4000
Dallas, Texas 75201
Telephone: (214) 855-7500
Email: tberghman@munsch.com
        jking@munsch.com

PROPOSED COUNSEL TO THE DEBTOR
AND DEBTOR-IN-POSSESSION

4914-6275-6470v.3

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into and made effective as of November [•], 2025 by and among Enchanted Way Operating LLC, a Texas limited liability company ("Purchaser OpCo"), Enchanted Way Ventures LLC ("Purchaser PropCo", and together with Purchaser OpCo, "Purchaser"), KellyBain Events, LLC, a Texas limited liability company ("KellyBain"), Laurel Events, LLC, a Texas limited liability company ("Laurel"), WOC Events Grapevine, LLC, a Texas limited liability company ("Property Owner", and together with KellyBain and Laurel, each, a "Seller", collectively, the "Sellers"). Capitalized terms used herein but not otherwise defined in this Agreement shall have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

**WHEREAS**, pursuant to that certain Asset Purchase Agreement, dated as of November 3, 2025 (as amended, restated, or otherwise modified from time to time, the "Purchase Agreement"), by and among Purchaser, Seller, and the other parties named therein (i) Seller has agreed to sell, assign, transfer, convey, and deliver to Purchaser, and Purchaser has agreed to purchase and acquire from Seller, all of Seller's right, title, and interest in, to and under the Purchased Assets, but excluding the Excluded Assets, and (ii) Purchaser has agreed to assume and pay, perform, and otherwise discharge when due the Assumed Liabilities, in each case, upon the terms and subject to the conditions set forth in the Purchase Agreement; and

**WHEREAS**, this Agreement is being executed and delivered by the parties in connection with the consummation of the transactions contemplated by the Purchase Agreement.

**NOW, THEREFORE**, pursuant to and in accordance with the terms and provisions of the Purchase Agreement, and for the consideration set forth therein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.	Assignment of Acquired Assets.  Upon the terms and subject to the conditions of the Purchase Agreement, Seller hereby sells, assigns, transfers, conveys, and delivers to Purchaser, and Purchaser hereby purchases and acquires from Seller, all of Seller's right, title, and interest in, to, and under the Purchased Assets.

2.	Assumption of Assumed Liabilities.  Upon the terms and subject to the conditions of the Purchase Agreement, Purchaser hereby unconditionally and irrevocably accepts the foregoing assignment and assumes the Assumed Liabilities, and agrees to pay, perform, and discharge, as and when due, all of the Assumed Liabilities.

3.	Further Assurances.  At any time and from time to time following the Closing, at the request of any party hereto and without further consideration, each other party hereto shall execute and deliver, or cause to be executed and delivered, such further documents and instruments and shall take, or cause to be taken, such further actions as the requesting party may reasonably request or as otherwise may be necessary or desirable to evidence and make effective the transactions contemplated by the Purchase Agreement and the Transaction Documents.

4.	Governing Law.  This Agreement shall be governed by, and construed in accordance with, the substantive laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule that would cause the application of the law of any jurisdiction other than the State of Texas.

5. <u>Counterparts</u>. This Agreement may be executed and delivered (including by facsimile, "pdf," or other electronic transmission) in any number of counterparts, each of which shall be deemed to be an original instrument, and all of which together shall constitute one and the same agreement.

6. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

7. <u>Headings</u>. The headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

8. <u>Relationship to Purchase Agreement</u>. This Agreement is executed and delivered pursuant to, is in furtherance of, and is subject to the terms and conditions of, the Purchase Agreement. In the event of any conflict between the terms of the Purchase Agreement and the terms of this Agreement, the terms of the Purchase Agreement shall prevail. Nothing contained in this Agreement shall be deemed to alter, modify, expand, or diminish the terms or provisions of the Purchase Agreement.

*[Signature page follows]*

4915-2284-3767v.2

IN WITNESS WHEREOF, each party has caused this Assignment and Assumption Agreement to be duly executed and delivered by its authorized representative as of the date first above written.

<u>**PURCHASER**</u>:

**ENCHANTED WAY OPERATING LLC**

By:_____
Name: _____
Title: _____

**ENCHANTED WAY VENTURES LLC**

By:_____
Name: _____
Title: _____

<u>**SELLERS**</u>:

**KELLYBAIN EVENTS, LLC**

By:_____
Name:
Title:

**LAUREL EVENTS, LLC**

By:_____
Name:
Title:

**WOC EVENTS GRAPEVINE, LLC**

By:_____
Name
Title:

**EXHIBIT D**

**<u>FORM OF BILL OF SALE</u>**

## BILL OF SALE

This BILL OF SALE is entered into and made effective as of [•], 2025 by and among Enchanted Way Operating LLC, a Texas limited liability company ("Purchaser OpCo"), Enchanted Way Ventures LLC ("Purchaser PropCo", and together with Purchaser OpCo, "Purchaser"), KellyBain Events, LLC, a Texas limited liability company ("KellyBain"), Laurel Events, LLC, a Texas limited liability company ("Laurel"), WOC Events Grapevine, LLC, a Texas limited liability company ("Property Owner", and together with KellyBain and Laurel, each, a "Seller", collectively, the "Sellers"). Capitalized terms used herein but not otherwise defined in this Bill of Sale shall have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

**WHEREAS**, pursuant to that certain Asset Purchase Agreement, dated as of November 3, 2025 (as amended, restated, or otherwise modified from time to time, the "Purchase Agreement"), by and among Purchaser, Seller, and the other parties named therein, Seller has agreed to sell, assign, transfer, convey, and deliver to Purchaser, and Purchaser has agreed to purchase and acquire from Seller, all of Seller's right, title, and interest in, to, and under the Purchased Assets;

**WHEREAS**, Purchaser and Seller are hereby effecting such transfer and assignment of all right, title, and interest of Seller in and to the Purchased Assets; and

**WHEREAS**, this Bill of Sale is being executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by the Purchase Agreement.

**NOW, THEREFORE**, in consideration for the execution of the Purchase Agreement, the payment of the consideration stipulated in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as follows:

1.       Seller does hereby grant, bargain, transfer, sell, assign, convey and deliver unto Purchaser, all of its right, title and interest in and to the Purchased Assets.

2.       Seller disclaims all warranties, including, without limitation, all implied warranties of merchantability or fitness for a particular purpose. Purchaser acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby and is receiving such assets AS IS/WHERE IS and with all faults.

3.       Seller for itself, its successors and assigns, hereby covenant and agree that, at any time and from time to time upon the written request of Purchaser, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances and confirm unto and vest in Purchaser as may be reasonably required by Purchaser in order to assign, transfer, set over, convey, assure, its successors and assigns, title to the assets sold, conveyed and transferred by this Bill of Sale.

4.       This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Texas, as applied to contracts made and performed entirely in such state.

5.       This Bill of Sale is executed and delivered pursuant to, is in furtherance of, and is subject to the terms and conditions of, the Purchase Agreement.  In the event of any conflict between the terms of the Purchase Agreement and the terms of this Bill of Sale, the terms of the Purchase Agreement shall prevail.  Nothing contained in this Bill of Sale shall be deemed to alter, modify, expand or diminish the terms or provisions of the Purchase Agreement.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the date first above written, and Purchaser hereby accepts, acknowledges, and consents to the terms and provisions of this Bill of Sale.

**PURCHASER**:

**ENCHANTED WAY OPERATING LLC**

By:_____
Name: _____
Title: _____


**ENCHANTED WAY VENTURES LLC**

By:_____
Name: _____
Title: _____


**SELLERS**:

**KELLYBAIN EVENTS, LLC**

By:_____
Name:
Title:


**LAUREL EVENTS, LLC**

By:_____
Name:
Title:


**WOC EVENTS GRAPEVINE, LLC**

By:_____
Name
Title:

Schedule 1

| No. | Name | Type of Event | Event Date | Event Day | |
|-----|------|---------------|------------|-----------|---|
| 3 | C | Wedding | 2/21/2026 | Saturday | |
| 4 | D | Wedding | 2/28/2026 | Saturday | |
| 5 | E | Wedding | 3/21/2026 | Saturday | |
| 6 | F | Wedding | 3/28/2026 | Saturday | |
| 7 | G | Wedding | 4/11/2026 | Saturday | |
| 8 | H | Wedding | 4/18/2026 | Saturday | |
| 9 | I | Wedding | 4/25/2026 | Saturday | |
| 10 | J | Wedding | 5/2/2026 | Saturday | |
| 11 | K | Wedding | 5/9/2026 | Saturday | |
| 12 | L | Wedding | 5/30/2026 | Saturday | |
| 13 | M | Wedding | 6/5/2026 | Friday | |
| 14 | N | Wedding | 7/11/2026 | Saturday | |
| 15 | O | Wedding | 8/1/2026 | Saturday | |
| 16 | P | Wedding | 8/8/2026 | Saturday | |
| 17 | Q | Wedding | 8/15/2026 | Saturday | |
| 18 | R | Wedding | 8/29/2026 | Saturday | |
| 19 | S | Wedding | 9/12/2026 | Saturday | |
| 20 | T | Wedding | 10/9/2026 | Friday | |
| 21 | V | Wedding | 10/10/2026 | Saturday | |
| 22 | W | Wedding | 11/7/2026 | Saturday | |
| 23 | X | Wedding | 12/5/2026 | Saturday | |
| 24 | Y | Wedding | 11/7/2027 | Sunday | |
| Totals | | | | | |

## Schedule 2.8

Lot 1, Block 1, Water Oaks Event Center, an Addition to the City of Grapevine, Tarrant County, Texas, according to the plat thereof recorded under Clerk's file No. D215041532, Official Public Records of Tarrant County, Texas